UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| In re: | Chapter 11 |
| THE BARTECH GROUP OF ILLINOIS, INC. | Case No. 22-10945 |
| Debtor. | Honorable Timothy A. Barnes |

**(MODIFIED) FOURTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION
FOR SMALL BUSINESS DEBTOR UNDER SUBCHAPTER V**[1]

The BarTech Group of Illinois, Inc., the debtor and debtor-in-possession in the above captioned bankruptcy proceeding (the "**Debtor**") and a small business debtor under Subchapter V, hereby proposes the following Chapter 11 plan of reorganization pursuant to section 1189 of the Bankruptcy Code.

**Article 1:      ARTICLE I: CASE BACKGROUND**

On September 23, 2022 (the "**Petition Date**"), the Debtor commenced this proceeding by filing a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code, as a small business Subchapter V debtor.  On September 26, 2022, the Bankruptcy Court appointed William B. Avellone as the Subchapter V trustee (the "**Subchapter V Trustee**").  Pursuant to section 1190(1) of the Bankruptcy Code, in addition to background information and brief history of the Debtor's business operation, attached to the Plan are various Exhibits in support of the Plan, including (i) a liquidation analysis attached as **Exhibit A**, and (ii) the Debtor's financial projections with respect to its ability to make proposed payments under the Plan attached as **Exhibit B**.

### 1.1   Description and History of the Debtor's Business

The Debtor is C Corporation with its headquarters in South Holland, Illinois.  It was founded in 2006 and is now operating as a minority owned business and is a minority owned and operated business.  The Debtor's business involves electrical and fencing and construction work. More information about the Debtor's products and services can also be found on its website: https://www.thebartechgroup.biz

The Debtor currently has approximately 95 employees (during the peak season the debtor usually employees up to 130 full-time employees).

### 1.2   Events Leading to Bankruptcy Filing

---

[1] Pursuant to Bankruptcy Rule 3016(d), the Plan conforms with Official Form 425A (Plan of Reorganization for Small Business Under Chapter 11) and includes all Articles.

The Debtor's revenue became severely compromised during the Covid -19 pandemic, as contracts and projects the Debtor was able to line up before Covid-19 were delayed or summarily cancelled. The Covid-19 Pandemic led to project and material delays of major consequence and led to a dramatic increase in operating and business expenses. Despite all efforts, the Debtor was not able to fully eliminate all of the lingering effects of this Pandemic.

To help with the need to sustain its business and employees, most being union workers, the Debtor obtained a Paycheck Protection Program loan from the SBA for $1.8 million dollars (the "**PPP Loan**") during the Covid-19 pandemic. However, the amount proved insufficient to sustain the Debtor's work force, posing a grave dilemma for the Debtor as its dwindling cash flow from operations implicated its union contracts, such that retention of its work force required expenditures for the union pension funds, forcing the Debtor to resort to Cash Advance Lenders which further eroded the Debtor's cash flow leaving the Debtor without funds to pay taxes.

As noted, pre-petition, the Debtor entered into certain short-term loans, which for the most part seem similar to factoring contracts, with Libertas Funding LLC, and Fox Business Funding, as listed in the Cash Collateral Motion (the "**Cash Advance Lenders**"). The Debtor reserves all rights with respect to the Cash Advance Lenders, including with respect to the predatory nature of the transactions, the true nature of the underlying agreements as secured loans which are subject to statutory and regulatory provisions, and avoidance of re-payments as preferential transfers or fraudulent conveyances.

### 1.3    The Debtor's Assets

The Debtor's assets and estimated value are listed in its Schedule B filed on October 25, 2022 [Doc. No. 80], which reflects for the most part book value of the Debtor's assets. Such assets are also reflected in the Liquidation Analysis to be attached as **Exhibit A**.

The Liquidation Analysis includes and addresses the scheduled, and/or estimated market value of the Debtor's assets as of confirmation of the Plan, including with respect to estimated value for accounts receivable[2] after deductions, if any.

### 1.4    The Debtor's Pre-Petition Debts/ Liabilities

Pursuant to the Order Setting Subchapter V Status Conference and Deadlines for Filing of Plan, Claims and Elections under 11 U.S.C. § 1111(b), dated September 27, 2022 [Doc. No. 8], the general bar date for creditors to file their claims was December 2, 2022 (the deadline for governmental authorities was March 22, 2023 under section 502(b)(9) of the Bankruptcy Code). The description of the Claims provided below is based on the Debtor's Schedules and the proofs of claim filed by the bar date.[3] The ultimate amount due to the various holders of Claims will be determined upon completion of the claims objection process.

### *A. Fifth Third Bank Loan*

---

[2] Some of the accounts receivable are presently in the form of retainage for which more work is required on the various projects. As the Debtor has been delayed in obtaining requisite bonds for many of its projects, that caused significant contractual penalties and affected timing, viability and collectability of the accounts receivable.

[3] All Claims are subject to the claims objection process.

Pre-petition, the Debtor entered into a certain Business Loan Agreement, dated June 18, 2021 with Fifth Third Bank.  According to the proof of claim filed by ~~the~~Fifth Third Bank (claim #15), the pre-petition Secured Claim amount is $820,949.23 (the "**Fifth Third Bank Loan**").[4] The loan documents include a promissory note, a Commercial Guaranty, and a UCC-1 financing statement filed by MB Financial Bank, N.A. on December 30, 2018 (annexed to the Bank's proof of claim with respect to substantially all assets of the Debtor).[5]  The maturity date under the promissory note was June 17, 2022.  According to the Bank's proof of claim, the loan accrues interest at 6.25%, and the asserted pre-petition claim amount is $820,949.23.  As adequate protection Fifth Third Bank has received monthly adequate protection payments of $20,000.00, totaling $120,000.00 through March 8, 2023.  This loan is guaranteed by Mr. Barlow.

### B.  *Other Secured Loans*[6]

As reflected in Schedule D, the Debtor has several loans related to the purchase and/or finance of certain equipment in connection with operation of the business, including Caterpillar Financial Services (UCC-1 financing statement filed 6/5/2018 and 6/13/2019 for certain equipment assets).  Caterpillar Financial filed a proof of claim in the amount of $24,670.20.

As reflected in Schedule D, the Debtor has several vehicle loans in connection with operation of the business.  The loan documents are generally retail installment sale contracts.  The Debtor's principals, Mr. Barlow and Mr. Garrett are guarantors or co-signers for some of the automobile loans. Such creditors with filed proofs of claim include the following:

(i)    Ally Bank: This creditor filed several proofs of claim.  Ally Bank filed motions for relief from the automatic stay or in the alternative for adequate protection regarding the following:[7]

- *2020 Ford Edge Utility 4D SE 2.0L I4 Turbo*: The stay relief motion was filed on March 24, 2023 [Doc. No. 224].  On March 29, 2023, the Debtor ~~file~~filed a response to the stay relief motion proposing to retain the vehicle and continue making monthly payments [Doc. No. 237].  A continued hearing is scheduled on this matter for ~~May 3~~June 7, 2023~~.~~ [Doc. No. 291].

- *2019 Ford Ranger Extended Cab XL 4WD*: The stay relief motion was filed on March 28, 2023 [Doc. No. 227].  On March 29, 2023, the Debtor ~~file~~filed a response to the stay relief motion proposing to retain the vehicle and continue making monthly payments [Doc. No. 238].  A continued hearing is scheduled on this matter for ~~May 3~~June 7, 2023~~.~~ [Doc. No. 292].

---

[4] ~~The~~Fifth Third Bank also filed another proof of claim for $51,312.64 (unsecured) related to credit card debt.

[5] MB Financial Bank, N.A. is now Fifth Third Bank.

[6] CT Corporation System, as representative, filed a UCC-1 financing statement on December 16, 2021 (the Debtor and DKB Holdings LLC), and on January 26, 2022 (the Debtor).  The Debtor reserves all rights with respect to the actual creditor.

[7] On April 12, 2023, the Court entered an order [Doc. No. 251] requiring the Debtor to provide proof of insurance to counsel for Ally Bank related to the first two stay relief motions [Doc. No. 224, and Doc. No. 227].

- *2019 Ford F-250 Super Duty Crew Cab XL 4WD 6.2L V8*: The stay relief motion was filed on April 20, 2023 [Doc. No. 255]. On April 26, 2023, the Debtor ~~file~~filed a response to the stay relief motion proposing to retain the vehicle and pay arrearages on the Plan effective date [Doc. No. 268]. A hearing is scheduled on this matter for June 7, 2023 [Doc. No. 293].

- *2019 Ford F-150 Extended Cab XL EcoBoost 4WD 2.7L V6 Turbo*: The stay relief motion was filed on April 20, 2023 [Doc. No. 256]. On April 26, 2023, the Debtor ~~file~~filed a response to the stay relief motion proposing to retain the vehicle and pay arrearages on the Plan effective date [Doc. No. 269]. A hearing is scheduled on this matter for June 7, 2023 [Doc. No. 294].

- *2019 FORD COMMERCIAL Transit Commercial Vans 150 Van*: The stay relief motion was filed on April 21, 2023 [Doc. No. 261]. On April 26, 2023, the Debtor ~~file~~filed a response to the stay relief motion proposing to retain the vehicle and pay arrearages on the Plan effective date [Doc. No. 270]. A hearing is scheduled on this matter for June 7, 2023 [Doc. No. 295].

- *2018 Ford F-150 Crew Cab XLT 4WD 5.0L V8*: The stay relief motion was filed on April 28, 2023 [Doc. No. 283]. On May 24, 2023, the Debtor filed a response to the stay relief motion proposing to retain the vehicle and pay arrearages on the Plan effective date [Doc. No. 310]. A hearing is scheduled on this matter for June 7, 2023 [Doc. No. 301].

(ii)    Ford Motor Credit Corporation: This creditor filed a proof of claim for $31,470.35. On October 10, 2022, this creditor filed a motion for adequate protection payment [Doc. No. 49], which was amended on October 18, 2022 [Doc. No. 67]. The motion was approved on November 22, 2022 [Doc. No. 117].

(iii)   Mercedes-Benz Financial Services USA LLC:

This creditor filed a proof of claim for $39,323.62 regarding a certain 2011 Mercedes-Benz G55 motor vehicle (the car driven by Ben Garrett, a shareholder and officer of the Debtor). On February 16, 2023, this creditor filed a motion for relief from stay [Doc. No. 191]. The Debtor filed its limited objection on March 1, 2023 [Doc. No. 196] requesting that the Debtor's estate sell the vehicle pursuant to a Section 363 process instead. A continued hearing on the stay relief motion ~~is~~was last scheduled for May 3, 2023 [Doc. No. 275]. As a result of the private sale to CarMax referred to below, the stay relief motion was withdrawn on May 3, 2023 [Doc. No. 289]

On April 21, 2023, the Debtor filed a motion for order authorizing private sale of the vehicle to CarMax [Doc. No. 259], which was granted by the Bankruptcy Court on May 3, 2023 [Doc. No. 296]. Pursuant to such Order, CarMax is authorized to payoff the lien to Mercedes Financial Services for the vehicle in the amount of $38,910.44 and to submit the remaining balance from the sale of the vehicle tot the Debtor.

**C. Contracts and Equipment Leases**

The Debtor is a party to certain executory contracts and/or unexpired leases, as discussed in Article VII. The list of potential pre-petition contracts and leases to be assumed are listed in **Exhibit H** attached hereto (together with estimated cure costs). The Debtor reserves all rights as to whether a purported lease is a "true" lease or financing transaction, and as to whether a contract is "executory" for purposes of section 365 of the Bankruptcy Code.

The Debtor scheduled a claim for Altec Capital Services as secured in the amount of $50,358.00 (UCC-1 financing statement filed 5/13/2021 for certain equipment assets). PNC Bank, as assignee for Altec Capital Services, filed a proof of claim in the amount of $296,388.20 on the basis of breach of equipment lease. The filed proof of claim did not provide for any cure cost. Also, on October 14, 2022, PNC Bank filed a Motion For an Order Requiring Debtor to Assume or Reject Unexpired Lease and To Pay Administrative Expenses [Doc. No. 58]. The Debtor filed a response to PNC Bank's motion on October 28, 2022 [Doc. No. 89]. A hearing is currently scheduled on the PNC Bank's motion for June 7, 2023 [Doc. No. 273].

Runnion Equipment Company filed a proof of claim (amended 4/4/23) based on equipment rental agreement. The asserted cure cost under the proof of claim is $11,370.00. Also, on November 10, 2022, Runnion Equipment filed a Motion For an Order Requiring Debtor to Assume or Reject Unexpired Lease and To Pay Administrative Expenses [Doc. No. 108]. The Debtor filed a response to Runnion Equipment's motion on November 17, 2022 [Doc. No. 113]. A hearing is currently scheduled on the Runnion Equipment's motion for ~~May 17~~June 7, 2023 [Doc. No. ~~274~~304].

As discussed in Article VII, the Debtor is involved with many unions and /or related trusts as listed in **Exhibit G** attached hereto. After payment in full as proposed under the Plan, the union entities  and any related trusts shall issue to the Debtor good standing letters upon request by or on behalf of the Debtor.

### D.      *Cash Advance Lenders*

The Cash Advance Lenders allegedly filed UCC-1 financing statements against assets of the Debtor. The Cash Advance Lenders may have received the guaranty of Mr. Barlow. As mentioned above, the Debtor reserves all rights with respect to potential actions against the Cash Advance Lenders related to Potential Litigation and Avoidance Actions.

The Debtor maintains that the underlying agreements for the Cash Advance Lenders are not true factoring agreements (i.e., a lump sum payment for the right to collect accounts receivable) but are loan transactions. The Debtor asserts that the Liens, if any, of the Cash Advance Lenders may be wholly unsecured due to the insufficient value of collateral securing the senior obligations, depending on (i) the total Claim amount for the senior claims that are oversecured, including post-petition interest, reasonable fees, costs or other charges, to the extent applicable or permitted under Section 506(b) of the Bankruptcy Code, and (ii) the market value of the Debtor's assets as of confirmation of the Plan. If so, the unsecured portion of the Claims would be treated as a General Unsecured Claim. Also, the holders of pre-petition senior secured obligations did not subordinate their Liens with respect to the Cash Advance Lenders.

Pre-petition, the loan from Fox Business Funding was paid in full.  The Claim for
Libertas Funding LLC was scheduled for $64,285.00 as disputed.  No proofs of claim were filed
by the December 2, 2022 claim filing deadline, and, therefore, Libertas funding will receive no
distribution under the Plan.  Without having filed a proof of claim, any amount that may have
been otherwise owed, if valid and enforceable, will be treated under the Plan as disallowed and
time barred.

### E.  Illinois Department of Employment Security

The Illinois Department of Employment Security ("**IDES**") filed a proof of claim 3-2 in the amount of $93,755.60 (claiming $66,877.08 as secured, $26,013.52 as unsecured priority, and $865.00 as general unsecured).[8]  The Debtor disputes the Claim as being secured and as to the amount.  The IDES has agreed to file an amended proof of claim that would remove any lien, to the extent valid, and treat the $66,877.08 amount (previously filed as secured) as a priority Claim under section 507(a)(8) of the Bankruptcy Code to the extent such Claim is entitled to priority status.

### F. Priority Tax Claims/ Other Priority Claims

As mentioned above, the deadline for governmental authorities to file proofs of claims was March 22, 2023.  It appears several creditors have filed Priority Tax Claims so far, including Comptroller of Maryland ($40,300.00), IRS- Electronic Federal Tax Payment ($2,465,097.53), Illinois Department of Revenue ($161,617.64), the IDES ($26,858.38), and the IDES (as mentioned above and in the amended claim in the amount of $41,957.40).  Other scheduled Claims relate to Delaware Department of Labor, Pennsylvania Department of Revenue, and Virginia State withholding, totaling approximately $53,000.00.

In addition to Priority Tax Claims, several creditors filed proofs of claim that may be treated as Other Priority Claims, including (i) Architectural Iron Workers ($163,795.98), (ii) Electrical Insurance Trustees ($55,657.43), (iii) IBEW Local 701 Fringe Benefit ($53,190.24), (iv) Local 26 IBEW-NECA Joint Trust ($161,603.14), (v) Local 9 IBEW & Outside ($152,812.07), and (vi) Iron Workers Mid-America SMA Fund, and Pension Fund (totaling $9,313.91).[89]  Other scheduled Claims relate to IWDC Benefit & Pension Plan, National Electrical Ben.  Funds, totaling approximately $32,000.00.

Section 507(a)(4) addresses unsecured claims for (A) wages, salaries, or commissions, including vacation, severance, and sick leave, and (B) certain sale commissions, up to $15,150 for each claim.  Section 507(a)(5) addresses unsecured claims for contributions due employee benefit plans.  The applicable period under both sections is within 180 days "before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first…."  The Debtor reserves the right to object to the Priority Tax Claims and the Other Priority Claims with respect to the applicable maximum amount or cap under Sections 507(a)(4) and (5).

The Priority Tax Claims and Other Priority Claims, particularly accrued and unpaid tax amounts, are substantial.  The Debtor will continue to negotiate with such creditors and, if warranted as noted, file claim objections.  Allowed Priority Tax Claims and Other Priority Claims may be paid from proceeds of Potential Litigation and Avoidance Actions, if any.  Plan confirmation may be contingent upon the holders of Priority Tax Claims and Other Priority

---

[8] The IDES also filed another proof of claim 16-3 in the amount of $39,674.66. The IDES maintains this is a post-petition administrative claim for unpaid unemployment contributions.

[89] Iron Workers Local Union #444, and Will and Grundy Industry Advancement Trust Fund filed proofs of claim in minimal amounts.

Claims, including various taxing authorities, agreeing to their respective treatments and payments under the Plan. The Debtor reserves the right to require each of such Claim holders to confirm in writing acceptance of their treatment under the Plan. In addition, the Debtor reserves the right to object to the amount and/or propriety of each such Claim. The Debtor will continue to negotiate with such creditors and, if warranted as noted, file claim objections.

Allowed Priority Tax Claims and Other Priority Claims may be paid from proceeds of Potential Litigation and Avoidance Actions, if any.

### G. General Unsecured Claims

The Debtor's unsecured Claims are reflected in Schedule F. The total scheduled and filed unsecured Claims against the Debtor is listed in ***Exhibit C***, totaling approximately $4,770,000.00 (including potentially disputed Claims, and the PPP Loan amount assuming a proof of claim is timely filed). The major general unsecured creditors that have filed proofs of claim are as follows:

(i)      Anixter Inc.: This creditor filed a proof of claim in the amount of $53,357.05 as secured, and $14,659.72 as unsecured. Anixter did not provide any evidence of any security interest, and this creditor was allegedly paid in part via joint check by Mass Electric. The whole proof of claim amount will be treated as unsecured, to the extent Allowed.

(ii)      Architectural Iron Workers: This creditor filed a general unsecured claim in the amount of $106,749.28 (in addition to Other Priority Claim of $163,795.98).

(iii)      Fifth Third Bank: ~~The Bank~~This creditor filed a separate general unsecured claim in the amount of $51,312.64 related to credit card debt, in addition to its ~~secured claim~~Secured Claim.

(iv)      George Williams: This party filed a general unsecured claim in the amount of $296,000.00. The Debtor disputes this alleged obligation.

(v)      IBEW Local 701 Fringe Benefit: This creditor filed a general unsecured claim in the amount of $124,323.34 (in addition to Other Priority Claim of $53,190.24)

(vi)      IDES: As mentioned above, the filed a proof of claim is in the amount of $66,877.08 as secured, $26,013.52 as unsecured priority, and $865.00 as general unsecured. Since the Debtor disputes the Claim as being secured and as to the amount, the asserted secured portion will be treated as unsecured (therefore, a general unsecured claim amount of $67,742.08).

(vii)      IRS- Electronic Federal Tax Payment: This creditor filed a general unsecured claim in the amount of $769,055.24 (in addition to Priority Tax Claim of $2,465,097.53).

(viii) Normandy Machine Co.: This creditor filed a proof of claim in the amount of $67,280.00 for goods sold.

(ix)      Residence Inn- Heritage Inn: This creditor filed a proof of claim in the amount of $66,626.62.00 for hotel services.

John Burns Construction Company filed a proof of claim as undetermined related to amounts that may be due under certain subcontracts and projects. On October 28, 2022, the Debtor filed a motion for approval of stipulation concerning certain of the Debtor's subcontracts with John Burns Construction Company and joint checks to Virginia Transformer Corporation. An agreed order was entered on November 9, 2022 [Doc. No. 106]. Also, on March 7, 2023, John Burns Construction Company filed a Motion to Compel the Debtor to Assume or Reject The Barry Subcontract [Doc. No. 205]. On March 20, 2023, the Debtor filed a response to the creditor's motion to compel assumption or rejection the subcontract [Doc. No. 218].[9][10] On April 26, 2023, the Court entered an order in part the motion to compel requiring the Debtor to assume or reject the subcontract on or before March 29, 2023 (if the subcontract is not assumed or rejected by May 5, 2023, the subcontract will be deemed rejected). A continued hearing is scheduled for [Doc. No. 276] . On May 34, 2023, the Court entered an Agreed Order Rejecting the Debtor's Barry Subcontract with John Burns Construction Company [Doc. No. 297].

Iron Workers Mid-America Supplemental Monthly Annuity (SMA) Fund and Iron Workers Mid-America Pension Fund (the "**Pension Funds**") filed a proof of claim alleging priority under Section 507(a)(4) in the amount of $3,208.87 and $6,105.04, and unsecured claims in the amount of $27,030.42 and $26,112.99. On January 19, 2023, the Pension Funds filed a Motion for Relief From the Automatic Stay [Doc. No. 168], pursuant to which the Pension Funds seek to pursue rights under a wage and welfare bond posted by the Debtor. On January 27, 2023, the Debtor filed a response [Doc. No. 175], and the Court entered an order granting the stay motion on February 7, 2023 [Doc. No. 179].

The SBA Claim related to the PPP Loan was listed as "contingent" on the Debtor's Schedule F ($1,801,685.00). No proof of claim was filed by the SBA before the expiration of the December 2, 2022 general proof of claim deadline. Without a filed proof of claim by the March 22, 2023 governmental bar date (if applicable), any amount that may have been otherwise owed, if valid and enforceable, will be treated under the Plan as disallowed and time barred.

## 1.5    Administrative Expense Claims

After the Petition Date, the Debtor for the most part has paid its operating expenses and obligation as they become due but was forced to delay certain payments, including cash collateral adequate protection payments, due to unauthorized holdings by general contractor(s). The total accrued and unpaid Administrative Expense Claims is listed on ***Exhibit D*** attached hereto (not including Professional Fee Claims).

On November 22, 2022, the Debtor's counsel filed its first interim fee application requesting compensation in the amount of $75,000.00 and payment of incurred expense sin the amount of $2,152.26 [Doc. No. 118]. The fee application was granted on December 21, 2022 [Doc. No. 151].

The Debtor estimates that the additional Professional Fee Claims will be approximately $435,000.00$540,000.00 (through confirmation of the Plan), expected to be allocated as follows: (i) approximately $375,000.00$475,000.00 for Professional Fee Claim of the Debtor's bankruptcy

---

[9][10] On April 12, 2023, the Court entered an order [Doc. No. 251] requiring the Debtor and John Burns to work towards an agreement by April 26, 2023 with respect to the motion filed by John Burns [Doc. No. 205].

counsel, and (ii) approximately $~~60,000.00~~65,000.00 for fees and expenses related to the Subchapter V Trustee.  It is expected that the Professional Fee Claims will be paid on the Effective Date or throughout the term of the Plan.  The Debtor has been paying the accountant monthly in ordinary course.

### 1.6    Use of Cash Collateral

Post-petition, on September 28, 2022, the Debtor filed a motion for authority to use cash collateral [Doc. No. 23] (the "**Cash Collateral Motion**").  In connection with the Cash Collateral Motion, the Debtor proposed (i) as adequate protection, that ~~the~~Fifth Third Bank, as the senior secured creditor, be granted certain post-petition replacement liens and security interests in property of the Debtor's estate to the extent such lienholders held validly perfected liens and security interests as of the Petition Date, and (ii) protection payments in the amount of $20,000.00 to Fifth Third Bank by agreement with the Bank.

In connection with the Cash Collateral Motion, the grant of post-petition Lien in property of the Debtor's estate is to the extent applicable secured creditor(s) held validly perfected ~~liens~~Liens and security interests as of the Petition Date.  The post-petition Lien shall only secure the amount of any diminution in the value of the secured creditor's prepetition collateral constituting cash collateral resulting from the Debtor's use thereof in the operation of the Debtor's business in the post-petition period.  The post-petition Lien shall have the same priority, validity, and enforceability as the creditor's Lien on its pre-petition collateral.

The Bankruptcy Court granted the Cash Collateral Motion on various occasions, including interim order entered on ~~April 26~~May 18, 2023 [Doc. No. ~~281~~306].  A continued hearing on the Cash Collateral Motion is scheduled for ~~May 17~~June 7, 2023 [Doc. No. ~~272, Doc. No. 281~~305 and 307].  The Debtor believes that confirmation of the Plan may render moot any further request or relief under the Cash Collateral Motion, including any objection.

### 1.7    Post-Petition DIP Financing

On December 8, 2022, the Debtor filed a motion for order (i) authorizing the Debtor to obtain postpetition financing, and (ii) granting super-priority claim, security interest, and priming first priority lien to the DIP Lender [Doc. No. 127] (the "**DIP Financing Motion**").  The Court entered an order granting the DIP Financing Motion on December 23, 2022 [Doc. No. 152].

Pursuant to the DIP Financing Motion, the Debtor sought approval of a post-petition financing from DB SPV I LLC, as the DIP lender or Plan funder (the "**DIP Lender**") on an interim basis in an amount up to $400,000.00 ("**DIP Loan**").  Attached to the DIP Financing Motion is the Debtor-in Possession Loan and Security Agreement, dated as of December 8, 2022 (the "**DIP Credit Agreement**") between the Debtor and the DIP Lender.  The maturity date under the DIP Credit Agreement is the earliest of: (a) one year from the date of entry of the interim order, (b) the date of the occurrence of any event of default under the DIP Credit Agreement or any other loan documents, or (c) the sale of the Debtor's assets.

As discussed in the DIP Financing Motion, the DIP Loan was used exclusively for the union employee benefit bonds ~~(the "**Bonds**")~~ required for certain post-DIP Loan work to be

incurred at the Debtor's job sites.  The Debtor has utilized the DIP Loan proceeds as a source to cover $400,000 of the $450,000 bond payment that the Debtor would generally require as it starts a new project.

Pursuant to the DIP Financing Motion, the Debtor sought authority to grant to the DIP Lender a super-priority lien pursuant to sections 364(c)(2) and (3) and (d)(1) of the Bankruptcy Code with priority over all pre- and post-petition claims against the Debtor, other than administrative expenses for estate professional fees and certain other administrative expenses in the case.  The DIP collateral in connection with the DIP Financing Motion includes all assets and properties, whether real, personal, intellectual, or otherwise, whether tangible or intangible, whether domestic, foreign, or international, that the Debtor now owns or hereafter acquires, or to or in which the Debtor, now or in the future, holds any right, title, or interest (whether fixed, contingent, inchoate, or otherwise), subject to exclusions under the DIP Credit Agreement, if any.

### 1.8    **Other Post-Petition Matters**

Soon after the Petition Date, on September 23, 2022, the Bankruptcy Court issued the Notice of Chapter 11 Bankruptcy Case and Scheduling Order [Doc. No. 27] scheduling the Section 341 meeting of creditors for September 29, 2022, and establishing certain deadlines, including a bar date for filing of claims, as noted above. Post-Petition, the Debtor filed several motions and other pleadings in connection with administration of the bankruptcy estate, including the following:

(i)    Application to employ Riemer & Braunstein LLP, as the Debtor's bankruptcy counsel filed on September 27, 2022 [Doc. No. 7].  The Order granting the retention of Debtor's counsel was entered on October 19, 2022 [Doc. No. 74].

(ii)    On September 28, 2022, the Debtor filed a motion for authority to pay pre-petition employee wages, amounts due to other pre-petition employment related obligations arising [Doc No. 24].  This motion was granted but payments were discretionary as being solely to the extent the Debtor had sufficient funds to make any such payments without disruption to the cash flow necessary to operate the Debtor's business [Doc. No. 100] (the "**Wage Order**").

(iii)    On October 16, 2022, the Debtor filed a motion for authority to continue using certain existing bank accounts with the Debtor's pre and business forms [Doc. No. 62].  Both the ~~subchapter~~Subchapter V ~~trustee~~Trustee and the US Trustee's office voiced no objections to the bank account motion.  The bank account motion was granted on October 19, 2022 [Doc. No. 76].~~10~~11  The Debtor ultimately opened its DIP bank accounts with Bank of America.~~11~~12

(iv)    On October 28, 2022, the Debtor filed its Section 1188(c) Status Conference Report [Doc No. 90]; the status conference was held on November 9, 2022.

---

~~10~~11 On October 16, 2022, the Debtor also filed a motion to approve stipulation regarding its cash management with Bank of America, N.A. [Doc. No. 60], which was approved by the Court on October 19, 2022 [Doc. No. 75].

~~11~~12 A levy on the debtor's DIP account was filed in violation of the automatic stay; however, Debtor's counsel was able to facilitate a release of levy.

(v)    The application to employ Ringold Financial Management Services, Inc. as the Debtor's accountant was filed on November 7, 2022 [Doc. No. 98].  The Order granting the application to employ the accountant was entered on November 9, 2022 [Doc. No. 107].~~12~~13

(vi)    On December 7, 2022, the Debtor filed a Motion For Approval of Stipulation With Local 26 and Local 26 Union Pension Fund Regarding Payment From Funds Due The Debtor From Mass Electric [Doc. No. 120].  the stipulation is among the Debtor and the following other parties: (i) Electrical Welfare Trust Fund, Electrical Workers Local No. 26 Pension trust Fund, Electrical Local No. 26 Joint Apprenticeship and Training Trust Fund, Electrical Workers Local No. 26 Individual Account Fund, Local union No. 26, International Brotherhood of Electrical Workers ("**Local 26 Parties**"), and (ii) National Electrical Benefit Fund, National Electrical Contractors Association, D.C. Chapter, and Local Labor Management Cooperation Committee ("**LLMCC**").  The stipulation provides that the Debtor will institute an action against Mass. Electric Construction Company ("**Mass Electric**") for turnover of funds withheld from the Debtor and to bar Mass Electric from requiring suppliers to execute joint checks, and to pay the balances due the Debtor for work it has performed and for retainage ~~(the "Turnover")~~.  The Debtor agreed (i) to pay from the ~~Turnover~~Mass Electric turnover certain amounts to ~~the~~ Local 26 Parties and LLMCC, (ii) to pay the remainder of pre-petition contributions and union dues for work performed in the months of July to September 2022, and (iii) to pay additional post-petition contributions and union dues as they become due pursuant to the Debtor's obligations under certain related collective bargaining agreement.  The Court entered an order approving the stipulation on December 14, 2022 [Doc. No. 140].

(vii)    On December 16, 2022, the Debtor filed a Motion for Approval of Stipulation With Mass Electric Regarding Payments Due the Debtor From Mass Electric [Doc. No. 142] **(the "Mass Electric Stipulation")**. Pursuant to the ~~stipulation~~Mass Electric Stipulation, Mass Electric agreed to pay the Debtor remainder of certain payment applications.  The Debtor also agreed to pay certain amounts from such stipulation proceeds to the Local 26 Parties and LLMCC.  The Court entered an order approving the ~~stipulation~~Mass Electric Stipulation on December 20, 2022 [Doc. No. 144].

(viii)    On December 29, 2022, the Debtor filed its initial Chapter 11 Plan of Reorganization [Doc. No. 154].  The Debtor filed (i) First Amended Chapter 11 Plan of Reorganization on March 8, 2023 [Doc. No. 209], (ii) Second Amended Chapter 11 Plan of Reorganization on March 28, 2023 [Doc. No. 118], and (iii) Third Amended Chapter 11 Plan of Reorganization on April 19, 2023 [Doc. No. 254].  A confirmation hearing is scheduled for June 7, 2023 [Doc. No. 280], with the voting deadline and objection deadline of June 1, 2023 or as set forth in the plan filing notice to be served with the Plan solicitation documents.

(ix)    On March 10, 2023, the Debtor filed a motion for approval of stipulation with the Iron Workers Local 63 and Affiliated Funds (collectively, "**Local 63**") regarding payment from funds due the Debtor From the Kiewit Aldridge Joint Venture ("~~**KAJV**~~**Kiewit**") [Doc. No. 211].  ~~KAJV~~Kiewit is the general contractor on a certain project for which the Debtor is a subcontractor and for which Local 63 members as employees of the Debtor have provided services.  Pursuant

---

~~12~~13 On September 27, 2022, the Debtor filed the initial application to employ Ringold Financial Management Services as financial advisor [Doc. No. 10], which became moot pursuant to November 9, 2022 docket entry [Doc. No. 104].

12

to the stipulation, ~~KAJV~~Kiewit will make certain payments to the Debtor and certain other suppliers and subcontractors of the Debtor with respect to pre-petition obligations relating to the project.  Also, as long as Local 63 workers return to and remain on the jobs, the Debtor agrees to pay Local 63 certain unpaid obligations incurred post-petition from the ~~KAJV~~Kiewit payment.

(x)    On March 15, 2023, the Debtor filed an adversary proceeding, Case No. 23-ap-00060, against (i) International Brotherhood of Electrical Workers Local 134 Union (a/k/a IBEW LOCAL 134 and Local Number 134, International Brotherhood of Electrical Workers), and (ii) Electrical Insurance Trustees (a/k/a IBEW 134 Electrical Insurance Trustee) ("**Local 134**") [Doc. No. 213].  Despite the Debtor's efforts to obtain the DIP Financing and procure the ~~Bonds~~bonds to satisfy Local 134's requirements, Local 134 has continued to prohibit its members from returning to the Debtor's jobs, conditioning such return on the payment of pre-petition obligations.  The complaint alleges (i) violation of the automatic stay pursuant to 11 U.S.C. §362, (ii) preliminary injunction restraining and enjoining Local 134 and its agents from interfering with member employees from returning to work and preventing them from returning to the Debtor's job sites, (iii) breach of contract, and (iv) breach of implied covenant of good faith and fair dealing.  On April 12, 2023, the Debtor filed a motion to dismiss the adversary proceeding on the ground that the parties have reached a mutually agreeable resolution.

(xi)    On May 26, 2023, Kiewit filed a motion for relief from the automatic stay [Doc. No. 313] (the "**Kiewit Stay Relief Motion**") regarding amounts due to Local Union 9, IBEW Fringe Benefit Funds ("**Local 9**") and potential other vendors and suppliers and in connection with certain subcontract, dated January 23, 2019, between the Debtor and Kiewit (the "**Kiewit Subcontract**"). Local 9 filed a proof of claim (#35) for $191,727.11 of which $152,812.07 is claimed as priority. Pursuant to the Kiewit Stay Relief Motion, Kiewit is seeking to pay from certain retainage the filed Claim of Local 9 in the amount of $191,627.11, and certain vendor Claims in the amount of $566,805.00. The Debtor filed an objection to the Kiewit Stay Relief Motion on June 2, 2023. A hearing is scheduled on the Kiewit Stay Relief Motion for June 7, 2023. The parties agree to continue the hearing on the Kiewit Stay Relief Motion until the next available motion day. The Debtor will decide whether to assume or reject the Kiewit Subcontract in connection with the continued hearing on the Kiewit Stay Relief Motion, including if post-confirmation, pursuant to sections 365(d)(2) and 1123(b)(2) of the Bankruptcy Code.

(xii)    On May 26, 2023, Mass Electric filed a motion for relief from the automatic stay [Doc. No. 315] (the "**Mass Electric Stay Relief Motion**") regarding amounts due to IBEW Local 26 Union and Benefit Funds ("**Local 26**") and in connection with certain subcontract, dated November 15, 2021, between the Debtor and Mass Electric (the "**Mass Electric Subcontract**"). Local 26 filed a proof of claim (#22) for $177,076.23 of which $161,603.14 is claimed as priority. Pursuant to the Mass Electric Stay Relief Motion, Mass Electric is seeking to pay to Local 26 from certain retainage a total amount of $113,118.50. The Debtor filed an objection to the Mass Electric Stay Relief  Motion on June 2, 2023. A hearing is scheduled on the Mass Electric Stay Relief Motion for June 7, 2023. The Debtor does not believe that the Mass Electric Subcontract is executory or subject to assumption  for purposes of section 365 of the Bankruptcy Code as all services have been performed by the Debtor subject only to collecting the associated receivables.

The Debtor does not object to Mass. Electric making payment directly to Local 26 pursuant to the Mass Electric Stipulation. The parties agree as follows: (i) in full satisfaction of any Claim Local 26 has against Mass Electric and the Debtor, Mass Electric will pay Local 26 from the retainage $105,618.50 which will be deemed the Allowed amount of Local 26's priority claim, (ii) Local 26 will have an Allowed General Unsecured Claim in the amount of $7,973.09, (iii) Local 26 shall agree to sign a release to be provided by Mass Electric to Local 26, (iv) Mass Electric will pay to the Debtor $22,300.63 from the remaining retainage, and Mass Electric will be reimbursed in full for this advance from the subsequent retainage payments from the project owner, (v) Mass Electric will pay the Debtor $52,167.92 in full satisfaction of the 50% retainage payment received by Mass Electric under the Mass Electric Subcontract, (vi) the Debtor will deliver a release to Mass Electric regarding payment of the initial retainage received by Mass Electric and paid to the Debtor in the amount of $157,572.84, (vii) the Mass Electric Stay Relief Motion will be withdrawn on entry of the Confirmation Order, and (viii) the Mass Electric Subcontract will not be assumed or rejected under the Plan.

(xiii)   On May 31, 2023, the Debtor filed an emergency motion for approval of stipulation with Local 134 [Doc. No. 321], pursuant to which the Debtor agreed that Electrical Insurance Trustees is owed cure costs in the amount of $92,504.16 under certain agreement between Local 134 and the Electrical Contractors' Association of City of Chicago, dated August 25, 1921 (as amended to May 31, 2026). This Local 134 stipulation was approved on June 1, 2023.

### 1.9    Potential Post-Petition Litigation, and Avoidance Actions

The Debtor reserves all rights with respect to (i) any complaint against the Cash Advance Lenders and any other creditors for damages caused to the Debtor's business pre-petition, and (ii) any potential challenge of the Claims of the Cash Advance Lenders based on violation of the Illinois law ("**Potential Litigation**").  Proceeds from such Potential Litigation if any may be a source of distribution under the Plan.

The Debtor will work with the Subchapter V Trustee to determine if any Avoidance Action is appropriate before the applicable deadline,[13][14] including with respect to (i) the ordinary course nature of pre-petition payments or transfers and any other defense of the recipients, (ii) the value of such actions versus the cost of pursuing the recovery, (iii) any other reasonable due diligence required under section 547(b) of the Bankruptcy Code for any avoidance actions, and (iv) the nature of any potential  negative impact or effect on the business going forward if any such action is pursued.  Avoidance Actions may include, but not limited to, preference actions and recovery of certain payments made within 90 days of the Petition Date, including as set forth in the SOFA, and recovery of unauthorized prepetition or post-petition payments.  The Debtor expects Avoidance Actions related to pre-petition payments or transfers may be pursued as there is anticipated insufficient Disposable Income (or less than 10% recovery) during the five-year term of the Plan.

---

[13][14] Pursuant to section 546(a) of the Bankruptcy Code, the general two-year statute of limitation deadline for filing such actions will be in September 2024.  In the event of any Avoidance Action, including recovery of preference payments, the creditors will have the right to file a late claim pursuant to Section 502(h).

In the event the bankruptcy estate recovers proceeds from the Potential Litigation and the Avoidance Actions that would cause earlier distribution or payment to a Claim holder, as contemplated under the Plan, the Debtor will amend the Plan to reflect such changes, including the financial projections and proposed plan distribution exhibits.

### Article 2:     ARTICLE II: SUMMARY

2.1     **Plan Payments.** The Plan proposes to pay Allowed Claims of creditors of the Debtor as set forth in Articles IV and V of the Plan.  The Plan is for a period of five years.

2.2     **Claims and Interests**. The Plan provides for the following Claims and Interests:

(i)      Administrative Expense Claims (including Professional Fee Claims)
(ii)     Priority Tax Claims
(iii)    Other Priority Claims, if any (Class 1)
(iv)     DIP Financing Loan (Class 2)
(v)      Fifth Third Bank Loan (Class 3)
(vi)     Other Secured Loans (Class 4)
(vii)    General Unsecured Claims (Class 5)
(viii)   Interests (Class 6)

Administrative Expense Claims and Priority Tax Claims are not classified and will be paid as provided under Article IV of the Plan.

Holders of Claims and Interests in Class 1 to Class 6 will receive distributions or will be treated as provided in Article V of the Plan.

2.3     **Disclosure**.   All Claim and Interest holders should refer to Articles III and IV of the Plan for information regarding the precise treatment of their Claims and Interests.  **Your rights may be affected.  You should read these papers carefully and discuss them with your attorney, if you have one.  (If you do not have an attorney, you may wish to consult one.)**

### ARTICLE III: CLAIMS AND INTERESTS

2.4     **Non-Classified and Classified Claims and Interests**.  Pursuant to sections 507, 1123, 1129(a), and 1191(e) of the Bankruptcy Code, Allowed Claims and Interests shall be treated as follows under the Plan:

| *Claim/ Class* | *Impairment* | *Treatment*[*] | *Entitled to Vote?* |
|---|---|---|---|
| Administrative Expense Claims *(incl. Professional Fee Claims)* | N/A | Paid in full on the Effective Date and/or during the term of the Plan. | N/A |

[*] The Section 1188(c) Status Conference Report filed with the Bankruptcy Court [Doc. No.8] may have contemplated different treatment for certain Claims.

| Priority Tax Claims | N/A | Paid in full by installment payments over term of the Plan, or by agreement to be negotiated between the Debtor and the Claim holder. | N/A |
|---|---|---|---|
| **Class 1 -** Other Priority Claims (if any) | Impaired | Paid over the term of the Plan by agreement as to timing and payment amount to be negotiated with such Claim holders, **or** payments on the Effective Date. | Yes |
| **Class 2 -** DIP Financing Loan | Unimpaired | To receive monthly payments from the Debtor's cash flow with payment in full in accordance with the terms of the DIP Credit Agreement. | No |
| **Class 3 -** Fifth Third Bank Loan | Impaired | ~~Fifth Third will~~To receive monthly payment of at least $20,000.00 at the non-default rate of interest for approximately three (3) years or less, up to the ~~value of the Bank's collateral as of the Plan confirmation~~Allowed Secured Claim amount. | Yes |
| **Class 4 –** Other Secured Loans | Impaired | To receive monthly payments pursuant to the terms of the loan or transaction documents. | Yes |
| **Class 5 -** General Unsecured Claims | Impaired | Pro rata share in cash distribution from the Remaining Funds, if any. | Yes |
| **Class 6 –** Interests | Unimpaired | To retain membership interests in the Debtor as reconstituted by the Stock Transfer Transaction after the Effective Date. No distribution during the five-year term of the Plan. | No |

2.5     **No Admission**. The description of the Claims and estimation of the recoveries set forth above should not constitute an admission that the Claims are Allowed. The Plan recovery is a projection and the Debtor reserves all of its rights, claims and defenses with respect to any and all Claims.

2.6     **Post-Petition Interest; Fine and Penalties**. Allowed Claims shall not include any interest accrued subsequent to the Petition Date unless specifically provided otherwise under the Plan. Allowed Claims do not include any fines and /or penalties.

**Article 3:**     **ARTICLE IV: TREATMENT OF NON-CLASSIFIED CLAIMS**

As provided in section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims against the Debtor are not classified for the purpose of voting on, or receiving distributions under, the Plan. Such non-classified Claims shall be treated as follows pursuant to sections 1129(a)(9)(A) and (C) and 1191(e) of the Bankruptcy Code; provided however, it being noted that to the extent the Priority Tax Claims are not reduced by agreement such plan of reorganization may not be feasible and may result in a plan of liquidation.

### 3.1     **Administrative Expense Claims**.

The holders of Allowed Administrative Expenses Claims shall be paid in full in cash on the later of: (i) the date such Allowed Administrative Expense Claim becomes due in accordance with its terms, and (ii) the Effective Date; *provided that*, (i) the financial projections may provide for monthly payments during the term of the Plan for such Claims, (ii) Professional Fee Claims may be paid from the funding of the Exit Financing, and (iii) Administrative Expense Claims may be paid from certain retainage a list of which is attached as **Exhibit E**. Notwithstanding the foregoing, a holder of an Administrative Expense Claim may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

Within thirty (30) days after the Effective Date, each holder of Administrative Expense Claims (including Professional Fee Claims) shall file a request for payment of administrative expense Claim or final fee application for Professional Fee Claim, if not filed already. Any objection to such filed request or fee application may be filed by the objection deadline to be provided in the Confirmation Order.

All other post-Effective Date Claims and invoices may be paid by the Debtor in ordinary course in such amounts and on such terms as the creditor and the Debtor may agree, or, in the absence of an agreement, as ordered by the Bankruptcy Court.

### 3.2     **Priority Tax Claims**.

Each holder of an Allowed Priority Tax Claim shall be paid as follows: (A) payments pursuant to any agreement to be negotiated between the Debtor and the Claim holder, **or** (B) to receive installment payments (i) of a total value as of the Effective Date equal to the Allowed amount of such Claim without penalties or unmatured interest, and (ii) over a period ending five (5) years from the Petition Date, so as to be in compliance with Section 1129(a)(9)(C). An Allowed Priority Tax Claim shall include only post-Effective Date interest thereon at the non-default rate determined under applicable non-bankruptcy law as required by 11 U.S.C. § 511(b). In the event the Debtor elects to pay the Allowed Priority Tax Claim, if any, in installment payments, the Debtor will continue to make payment directly to holder of such Claim after the term of the Plan, if applicable, for any unpaid balance. Notwithstanding the foregoing, a holder of a Priority Tax Claim may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

As discussed above, such Claims may be paid from Litigation Proceeds and any proceeds from Recovery Actions.

3.3    ~~4.2~~ **Statutory Fees**. Not applicable in Subchapter V cases.

3.4    ~~4.3~~ **Prospective Quarterly Fees**. Not applicable in Subchapter V cases.

**Article 4:    ARTICLE V:  TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS**

4.1    **Treatment of Claims and Interests**. The categories of Claims and Interests listed below classify such Claims and Interests for all purposes, including voting, confirmation, and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  Claims against the Debtor (except as set forth in Article IV) are classified as follows:

**Class 1 – Other Priority Claims** (if any)

(a)    <u>Treatment</u>. In full and complete satisfaction, settlement, release and discharge of the Class 1 Claims, each holder of an Allowed Class 1 Claim shall be paid as follows: (A) payments during the five-year term of the Plan pursuant to any agreement to be negotiated between the Debtor and the Claim holder, **or** (B) to receive (i) deferred cash payments of a value as of the Effective Date equal to the Allowed amount of such Claim if Class 1 has accepted the Plan, or (ii) cash on the Effective Date of the Plan equal to the Allowed amount of such Claim if Class 1 has not accepted the Plan, so as to be in compliance with Section 1129(a)(9)(B); *provided that*, (a) payments to holders of Allowed Class 1 Claims shall remain subject to cap under Section 507 per employee, (b)  such Claims may be paid from certain retainage a list of which is attached as **Exhibit E**, (v) a portion of the union related  Other Priority Claims may be paid from the funding of the Exit Financing, and (d) the Debtor may make any applicable payment to any worker or employee at any time pursuant to the Wage Order.  Notwithstanding the foregoing, a holder of an Allowed Class 1 Claim may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

(b)    <u>Impairment and Voting</u>: Class 1 is impaired under the Plan.  Each holder of an Allowed Claim in Class 1 shall be entitled to vote to accept or reject the Plan with respect to the Class 1 Claim.

**Class 2 - DIP Financing Loan**

(a)    <u>Treatment</u>. In full and complete satisfaction, settlement, release and discharge of the Class 2 Claim, the ~~DIP Lender~~<u>holder of Allowed Class 2 Claim</u> shall receive monthly payments from the Debtor's cash flow with payment in full by the maturity date of the DIP Loan, in accordance with the terms of the DIP Credit Agreement and any Order approving the DIP Financing Motion.  Notwithstanding the foregoing, the DIP Lender may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

18

Subject to outcome of Potential Litigation, the Debtor reserves the right to refinance the DIP Loan to the extent lower interest rate can be obtained from another lender.  In the event of a refinancing and/or payoff, the Debtor will amend the financial projections and proposed plan distribution to reflect such changes.

b)      <u>Lien Retention</u>.  The DIP Lender shall retain the Lien securing the Class 2 Claim until payment in full of the Allowed Class 2 Claim.

(c)      <u>Impairment and Voting</u>.  Class 2 is unimpaired under the Plan.  The DIP Lender shall be presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject the Plan with respect to Class 2 Claim.

**Class 3 - Fifth Third Bank Loan**

(a)      <u>Treatment</u>. In full and complete satisfaction, settlement, release and discharge of the Class 3 Claim, ~~Fifth Third Bank~~the holder of the Allowed Class 3 Claim shall receive monthly payments of at least $20,000.00  at the non-default rate of interest for approximately three (3) years or less, ~~up to the value of the Bank's collateral as of the Plan confirmation~~as set forth in the financial projections attached as **Exhibit B,**  up to the Allowed Secured Claim amount. ~~The~~ Fifth Third Bank Loan will be re-amortized and paid as set forth in the financial projections attached as **Exhibit B**; *provided that* in the event the Fifth Third Bank Loan is not paid off within 2 years after the Effective Date of the Plan, the Debtor will pay to Fifth Third Bank an additional $20,000.00  Notwithstanding the foregoing, ~~the~~Fifth Third Bank may receive such other treatment as may be agreed upon by such holder and the Debtor.  Fifth Third Bank will continue to receive the $20,000 monthly adequate protection payment until the Effective Date of the Plan.

~~In the event the Bank's Claim is under-secured the balance of such Claim will be treated as a General Unsecured Claim under Class 5.~~The Debtor expects Fifth Third Bank's collateral value will be sufficient for its Secured Claim to be treated as fully secured in the event the Debtor receives the Exit Financing to continue its business operations. All rights of Fifth Third Bank to request updated financial statements from the Debtor, as permitted under the Fifth Third Bank loan documents, are reserved until full payment of the Fifth Third Bank Loan.

(b)      <u>Lien Retention</u>.  ~~The~~Fifth Third Bank shall retain the Lien securing the Class 3 Claim until payment of the Allowed Class 3 Claim as set forth in the Plan.

(c)      <u>Impairment and Voting</u>.  Class 3 is impaired under the Plan.  ~~The~~Fifth Third Bank shall be entitled to vote to accept or reject the Plan with respect to the Class 3 Claim.

**Class 4 – Other Secured Loans**

(a)     Treatment.  In full and complete satisfaction, settlement, release and discharge of
        the Class 4 Claim, the holders of Allowed Class 4 Claims shall receive monthly
        payments in accordance with the terms of the loan or transaction documents.
        Notwithstanding the foregoing, a holder of an Allowed Class 4 Claim may receive
        such other less favorable treatment as may be agreed upon by such holder and the
        Debtor.  If a Class 4 Claim is under-secured the balance of such Claim will be
        treated as a General Unsecured Claim under Class 5.

(b)     Lien Retention.  Holders of Class 4 Claims shall retain the Lien securing the Class
        54 Claim until payment of the Allowed Class 4 Claim as set forth in the Plan.

(c)     Impairment and Voting.  Class 4 is impaired under the Plan.  Holders of Class 4
        Claims shall be entitled to vote to accept or reject the Plan with respect to the
        Class 54 Claim.

**Class 5 – General Unsecured Claims.**

(a)     Treatment. In full and complete satisfaction, settlement, release and discharge of
        the Class 5 Claims, each holder of the Allowed Class 5 Claim shall receive a *pro
        rata* share in cash distribution from the Remaining Funds, if any.
        Notwithstanding the foregoing, the holder of an Allowed Class 5 Claim may
        receive such other less favorable treatment as may be agreed upon by such holder
        and the Debtor.

        Any distribution to holders of General Unsecured Claims will be from balance of
        the Remaining Funds, if any, after payment of other priority obligations as set
        forth in Section 6.1 of the Plan.

(b)     Impairment and Voting.  Class 5 is impaired under the Plan.  Each holder of a
        Class 5 Claim shall be entitled to vote to accept or reject the Plan.

**Class 6 – Interests.**

(a)     Treatment. The holders of Class 6 Interests will retain such Interests in the Debtor
        as reconstituted by the Stock Transfer Transaction after the Effective Date;
        *provided that*, such equity holders shall not receive any distributions under the
        Plan on account of such equity interests during the five-year term of the Plan.

(b)     Impairment and Voting:  Class 6 is unimpaired under the Plan.  The holder of
        Class 6 Interests shall be presumed to have accepted the Plan pursuant to section
        1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to
        accept or reject the Plan.

4.2     **Impairment of Claims or Interests**. A class of Claims or Interests is deemed
unimpaired under section 1124 of the Bankruptcy Code to the extent (i) the Plan leaves the legal,
equitable, and contractual rights of such  Claim or Interest unaltered, or (ii) notwithstanding  any
contractual provisions in any loan documents or applicable law entitles a creditor to demand or

receive accelerated payment of its Claim due to the occurrence of a default, if applicable, the Plan has cured any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, and the other requirements of section 1124(2) are met.

### Article 5:    ARTICLE VI:  DISTRIBUTIONS

5.1    **Plan Distributions**. Except as otherwise provided in the Plan, or by the agreement of the holder of an Allowed Claim and the Debtor, all distributions to holders of Allowed Claims under the Plan will be made (unless paid in ordinary course or on the Effective Date pursuant to Article IV) by the Subchapter V Trustee, as the plan administrator and disbursing agent.  In the event of a consensual Plan confirmed pursuant to section 1191(a) of the Bankruptcy Code, the terms of section 1183(c) shall apply.  In the event of a nonconsensual Plan confirmed pursuant to section 1191(b) of the Bankruptcy Code, the terms of section 1194(b) shall apply.[1]  The Subchapter V Trustee, as the plan administrator and disbursing agent, will pay his professionals fees incurred after the Effective Date as an Allowed Claim from the Remaining Funds.

For every quarter with Disposable Income, if any, the Debtor will send to the Subchapter V Trustee such Disposable Income amount to be distributed to creditors under the Plan.[2]  In addition, the Debtor will prepare and submit to the Subchapter V Trustee financial report and reconciliation statement showing the projected and actual net cash flow (including the line items for revenue and expenses).

The proposed or projected Disposable Income calculation is available as part of the five-year projections attached as **Exhibit B**.  Distributions, if any, to be made from the Remaining Funds will be made as follows: first, for expense of administering the Debtor's estate before or after the Effective Date (to the extent of such additional expenses are not already included in the estimate for Administrative Expense Claims); second, to Administrative Expense Claims, including Professional Fee Claim; third, to Priority Tax Claims, and Other Priority Claims (if any); and fourth, to General Unsecured Claims.  Claim holders under Class 2 to Class 5 will receive distributions as set forth in the Plan.

Plan distributions shall be mailed by first class mail, postage prepaid, to the address of such holder as provided in the Schedules or filed proof of claim, if any, unless the Subchapter V

---

[1] Section 1194(b) provides that the trustee shall make payments to creditors under the plan unless the plan or the confirmation order provides otherwise.

[2] Although section 1191(c)(2) speaks of "projected" disposable income being applied to the plan, literal construction and application may ignore the reality of the Debtor's business.  Final disposable income determinations cannot always be made strictly on the basis of cash flow projections which do not predict with any degree of precision the income a business will generate and the expenses it will incur, especially with the continuing effect of the Covid-19 pandemic and the recent approval of deployment of the DIP Loan proceeds.  In any event, the determination of what constitutes disposable income may be made on a case-by-case basis.  In re Schwarz, 85 B.R. 829 (Bankr. S.D. Iowa 1988) (in the context of a Chapter 12 case under section 1225(b)(1), the court found that the disposable income requirement contemplates the use of excess income for the continuation of the debtor's business from one year to the next or to sustain the operation); In re Coffman, 90 B.R. 878 (Bankr. W.D. Tenn. 1988) (agreed with the process established in In re Schwarz, and noted that to hold otherwise would seriously jeopardize the Chapter 12 debtor's ability to meet the feasibility requirement).

Trustee has been notified in writing of a change of address.  The Debtor and the Subchapter V Trustee shall have no obligation to locate such holders whose distributions or notices are properly mailed but nevertheless returned.

5.2     **Objections to Claims**. Any objection to Claims shall be prosecuted by the Subchapter V Trustee or the Debtor.  Except as otherwise provided by order of the Bankruptcy Court, such objection to a Claim against the Debtor may be filed until the later of: (a) the date that such Claim becomes due and payable in accordance with its terms, and (b) the Claims Objection Deadline.

5.3     **Distribution on a Disputed Claim.** No distribution will be made on account of a Disputed Claim unless such claim is an Allowed Claim.  If applicable, a reserve may be maintained for such Disputed Claims.

5.4     **Settlement of Disputed Claims.** The Debtor shall have the power and authority to settle and compromise a Disputed Claim with court approval and compliance with Bankruptcy Rule 9019.

5.5     **Uncashed Distributions**. Checks issued by the Subchapter V Trustee as distributions pursuant to the Plan shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof and thereafter shall be treated under the Plan as an unclaimed distribution.  The holder of the Allowed Claim to whom such check originally was issued shall make any requests for re-issuance of any check to the Subchapter V Trustee.  Any requests for re-issuance of such a voided check shall be made on or before forty-five (45) days after the expiration of the ninety (90) day period following the date of issuance of such check.  After such date, all funds held on account of any such voided check shall, in the discretion of the Debtor, be used to satisfy the costs of administering and fully consummating the Plan or become available cash for distribution in accordance with the Plan, and the holder of any such Claim shall not be entitled to any other or further distribution under the Plan on account of such Claim and shall be deemed to have waived its Claim and any right to a distribution thereon.

Article 6:       **ARTICLE VII: EXECUTORY CONTRACTS
AND UNEXPIRED LEASES**

      6.1    **Executory Contracts and Unexpired Leases**. The Debtor is  a party to certain executory contracts and/or unexpired leases, including real estate, vehicle and/ or equipment leases, including as set forth in Schedule G (as may be amended), **Exhibit H** attached hereto, and as discussed herein.  As mentioned in Section 1.4(C), the Debtor reserves all rights.[3]

      (a)    General Contracts; Leases. As mentioned above (Section 1.4(C)), the creditors that have filed proofs of claim based on leases include: (i) PNC Bank, as assignee for Altec Capital Services, and (ii) Runnion Equipment Company.  Both PNC Bank and Runnion Equipment also filed a Motion For an Order Requiring Debtor to Assume or reject Unexpired Lease and To Pay Administrative Expenses [Doc. No. 58 and Doc. No. 108].

      (b)    Union Contracts. The Debtor is involved with various unions and/or funds, including the entities listed in **Exhibit G** attached hereto.  If applicable, the Debtor intends to assume and assign to the reorganized Debtor its union contracts, to the extent executory for purposes of section 365 of the Bankruptcy Code. Most of the union related Claims will be treated as Other Priority Claims in any event.

      6.2    **Assumed Executory Contracts and Unexpired Leases.**  The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumption of the Debtor's executory contracts and/or unexpired leases pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, including as listed in **Exhibit H** attached hereto.  All assumed contracts and unexpired leases will be assigned to the reorganized Debtor.  The cure costs, if any, will be paid on the Effective Date of the Plan. If any dispute exists, as to any cure cots, such disputes will be adjudicated by the Court.  For the avoidance of doubt, all contracts, licenses, Disadvantaged Business Enterprise (DBE) certification, Minority Business Enterprise (MBE) status shall remain with the Debtor and be deemed assumed and assigned to the reorganized Debtor.

      6.3    **Rejected Executory Contracts and Unexpired Leases.** The Debtor anticipates there will not be any executory contracts and unexpired leases that that will be rejected as of the Effective Date of the Plan but reserves the right to reject any such contract or lease on or before the Confirmation Date.

      All Allowed General Unsecured Claims arising from the rejection of executory contracts or unexpired leases (if any), whether under the Plan or by separate proceeding, shall be treated as Claims in Class 5 under the Plan.  Any Claim arising from the rejection of executory contracts or unexpired leases under the Plan must be filed with the Bankruptcy Court within thirty (30) days after the Effective Date, which notice shall be delivered and deemed effective notice by mail to the respective party's address available to the Debtor.  The Debtor shall have sixty (60) days to object to or seek estimation of any proof of Claim filed hereunder or such additional time as may be ordered by the Court and may do so on any ground, including without limitation, that the contract or lease in question is not properly regarded as executory or unexpired.  Any such Claims that are not filed within such time will be forever barred from assertion against the Debtor, and the bankruptcy estate and shall not share in any distributions under the Plan.

---

[3] To the extent that any transaction is not a true lease then such creditor may or may not treated as a lease entitled to adequate protection payments under section 365(d)(5).

**Article 7:**          **ARTICLE VIII: MEANS FOR IMPLEMENTATION OF THE PLAN**

7.1      **Plan Implementation**. The Plan will be funded with (i) available cash or working capital, (ii) cash flow from ongoing business operation, (iii) Disposable Income, if any, (iv) proceeds from Potential Litigation and Avoidance Actions, if any, and (v) the Exit Financing. The Debtor will continue to operate in ordinary course of business.  Pursuant to section 1190(2) of the Bankruptcy Code, the Plan provides for the submission of all or such portion of the future earnings of the Debtor as is necessary for the execution of the Plan.

7.2      **Exit Financing.**  The Debtor is expected to receive from the Investor a certain $1,500,000.00 revolving credit facility as an exit funding subject to approval by the Court pursuant to Sections 105 and 364 of the Bankruptcy Code (the "**Exit Financing**") in connection with confirmation of the Plan.  The Exit Financing is subject to first priority security interest on all assets of the Debtor, including the Debtor's Employee Retention Credit (ERC) tax credit.  The terms of the Exit Financing are further set forth in the signed term sheet attached hereto as **Exhibit F**.

The Exit Financing, subject to execution of Loan Documents, shall be used to fund the Plan as follows, unless provided otherwise in the financial projections: $750,000 to be used in connection with confirmation of the Plan, and additional $750,000 for working capital.

Confirmation of the Plan shall constitute authorization for the Debtor to obtain the Exit Financing, pursuant to Sections 105, 364(c) and 364(d) of the Bankruptcy Code, with the Investor granted a super-priority claim, security interest, and priming first priority lien.

On the Confirmation Date, the Debtor shall be authorized to execute, release and deliver all documents reasonably necessary to consummate the transactions contemplated by the terms and conditions of the Plan, without further order or approval of the Bankruptcy Court, including, without limitation, any documents required in connection with the closing of the Exit Financing.

7.3      **Disposable Income; Best Efforts Test**.  Pursuant to the Debtor's financial projections (with proposed or potential Disposable Income Calculation) attached as ***Exhibit B***, the Debtor's projected Disposable Income, if any, will be used to make payment distributions under the Plan.  The Debtor believes that its five-year forecast is a reasonable reflection of its past performance with proper discount for the anticipated ongoing effect of the COVID-19 pandemic, supply-chain issues, increased costs throughout the construction industry and for shipping expenses, and loss of certain customers pre-petition.

7.4      **Fair and Equitable Analysis**.  In the event the impaired classes (Class 1, Class 3 to 5) do not vote to accept the Plan, and the requirements of section 1129(a)(8) and (10) of the Bankruptcy Code are not satisfied, the Bankruptcy Court may still confirm the Plan as part of a non-consensual/ cramdown process under section 1191(b) of the Bankruptcy Code as long as the Plan does not discriminate unfairly, and is fair and equitable, with respect to each impaired class of Claims and Interests that has not accepted the Plan.

Under section 1191(c) of the Bankruptcy Code, the condition that a plan be fair and equitable is different for secured creditors and unsecured claims:

(i)     For a secured claim with allowed claim, the provisions under section 1129(b)(2)(A) of the Bankruptcy Code require: (i) lien retention, and payments totally at least the allowed amount of such claim of at least the value of the creditor's interest in the collateral; (ii) in the event of a sale, the creditor's ~~lien~~Lien to attach to sale proceeds subject to section 363(k), **or** (ii) the realization of the indubitable equivalent of the creditor's claim.

(ii)    As a general matter and with respect to unsecured creditors, the fair and equitable requirements include (i) all of the projected disposable income of a debtor to be applied to make payments under the plan, **or** (ii) the value of the property to be distributed under the plan not to be less than the projected disposable income of the debtor.[4]  Also, the debtor should be able to make all payments under the plan, **or** there is reasonable likelihood that the debtor will be able to make all payments under the plan (provided the plan provides appropriate remedies to protect the holders of claims or interests in the event that the plan payments are not made).

Based on the above-mentioned requirements of Section 1191(c), the Plan does not discriminate unfairly, and is fair and equitable, with respect to all impaired classes.

(i)     Under the Plan, each holder of Secured Claim will retain its Lien or security interest and will receive payments totaling at least the allowed amount of its Claim.

(ii)    Whether a claim is secured or unsecured is determined in accordance with section 506(a) of the Bankruptcy Code, which provides that a secured creditor's claim is a "secured claim to the extent of the value of such creditor's interest in the estate's interest in such property… and is an unsecured claim to the extent that the value of such creditor's interest… is less than the amount of such allowed claim." Therefore, the holders of wholly unsecured Claims shall be treated as General Unsecured Claims under Class 5 to the extent allowed in any amount.  The purported security interests and Liens, if any, will be released as set forth in the Plan.

(iii)   The value of the property to be distributed under the Plan is not less than the projected Disposable Income of the Debtor.  In fact, the Plan provides that all of the Debtor's projected Disposable Income, if any, will be applied to make

---

[4] Similar to section 1129(a)(15) of the Bankruptcy Code, the language of section 1191(c)(2) requires that "the value of the property to be distributed under the plan" cannot be less than the projected disposable income of the debtor. That language does not require that a debtor pay all of its projected disposable income to unsecured creditors but only requires that the value of the property to be distributed under the plan (which would include property distributed to administrative, priority, secured, and unsecured creditors) is not less than the projected disposable income of the debtor.  See, In re Pfeifer, 2013 WL 5687512, *2 (Bankr. S.D.N.Y. October 18, 2013) (analysis in the context of section 1129(a)(15)); Baud v. Carroll, 634 F.3d 327, 340 (6th Cir. 2010) (same); In re Angeron, 2018 WL 6601130, *2 (Bankr. E.D. La. December 13, 2018) (same); In re Johnson, 2016 WL 8853601, *15 (Bankr. S.D. Ohio November 10, 2016) (same).

payments under the Plan.  Also, all proceeds from Potential Litigation and Avoidance Actions, if any, will be used to make distributions under the Plan.

(iv)   Moreover, as required under section 1191(c)(3) of the Bankruptcy Code, the Debtor expects that it will be able to make all payments under the Plan, as set forth in the financial projections attached as ***Exhibit B***.

7.5   **Appointment of Plan Administrator and Disbursing Agent**

On the Effective Date, the Subchapter V Trustee will be appointed as the plan administrator upon terms and conditions fully acceptable to the Subchapter V Trustee under the Plan for the purpose of making distributions to the holders of Allowed Claims entitled to distributions under the Plan.

7.6     **Execution of Necessary Documents.** Confirmation of the Plan shall constitute authorization for the Debtor, its agents, representatives, partners, affiliates, and successors or assigns to effectuate the Plan and enter into all documents, instruments and agreements reasonably necessary to effectuate the terms of the Plan.

7.7     **Amendment of Documents.** As of the Effective Date, all pre-Confirmation Date documents and agreements (whether written or oral) between the Debtor and any party (including any union or fund), including, without limitation, any instruments, contracts, notes, mortgages of trust, assignments, bills of sale, leases, property settlement agreements and purchase and sale agreements, shall be deemed to be amended as necessary to effectuate and conform to the terms of the Plan.  To the extent that there is any inconsistency between the Plan and any such documents and agreements, the terms of the Plan shall control.

7.8     **Management of the Business.**  Mr. Barlow will operate and manage the business after the Effective Date as the Debtor's president.  However, in the event of closing of the Exit Financing, the Investor may select and retain new operating officer and/or accountant professionals.

7.9     **Stock Transfer Transaction**. In exchange for the Investor facilitating the DIP Financing and the Exit Financing, the Debtor's principals have agreed to transfer 80% of their equity interests in the Debtor to the Investor on the Effective Date based on terms acceptable to the Investor and the Debtor's principals (the "**Stock Transfer Transaction**").  In the event the Investor and the Debtor's principals consummate the Stock Transfer Transaction, the Investor will own 80% of the reorganized Debtor, and the equity interests of Mr. Barlow and Mr. Garrett shall be diluted to an aggregate of 20% in the reorganized Debtor.  Mr. Barlow and Mr. Garrett may enter into employment contracts at base salaries plus other incentives, including the negotiation of repayment of initial promissory notes/investments.  All such employment contracts, if any, shall be disclosed to and approved by the Subchapter V Trustee.

7.10     **Vesting of Property; Free and Clear.**  Except as otherwise provided in the Plan, as of the Effective Date, all assets of the bankruptcy estate shall vest in the Debtor, and such property shall be free and clear of all claims and interests of creditors or any other interested parties pursuant to sections 1141(b) and (c) of the Bankruptcy Code.

7.11     **Preservation of Causes of Action.**  The Debtor will exclusively retain and may enforce, and the Debtor expressly reserves and preserves for these purposes, in accordance with section 1123(a)(5)(A) of the Bankruptcy Code, any Claims, demands, rights and causes of action that the Debtor or it estate may hold against any Person.  No preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims by virtue of or in connection with the confirmation, consummation of effectiveness of the Plan.  For the avoidance of doubt, such causes of action shall not be subject to any Lien.

**Article 8:**     **ARTICLE IX: DISCHARGE OF CLAIMS; RELEASE**

8.1     **Discharge.**  If the Debtor's Plan is confirmed under section 1191(a) of the Bankruptcy Code, on the Effective Date of the Plan, the Debtor will be discharged from any and all debts that arose before confirmation of the Plan, pursuant to section 1141(d)(1)(A).  If the Debtor's Plan is confirmed under section 1191(b) of the Bankruptcy Code, the Debtor will be discharged from any and all debts that arose before confirmation of the Plan, subject to completion of all payments proposed under the Plan, pursuant to section 1141(d)(1)(A), as provided under sections 1181(c) and 1192 of the Bankruptcy Code.  The Debtor will not be discharged of any debt imposed by the Plan.

8.2     **Injunction Relating to the Plan.** Upon entry of discharge pursuant to Section 9.1 of the Plan, all Persons are hereby permanently enjoined from commencing, continuing or enforcing in any manner or in any place, any action or other proceeding, whether directly, indirectly, derivatively or otherwise against the Debtor and its assets related to, on account of, or respecting any Claims, debts, rights, obligations, causes of action or liabilities discharged pursuant to the Plan.  During the term of the Plan, all creditors of the Debtor are temporarily enjoined from asserting any actions against the Debtor, and any guarantor of the Debtor's obligations or co-debtors as long as such obligations remain current under the Plan.

8.3     **Releases.**  Upon entry of discharge pursuant to Section 9.1 of the Plan, in consideration for, among other things, the obligations of the Debtor under the Plan and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan: (a) each holder of a Claim that votes in favor of the Plan and (b) to the fullest extent permissible under applicable law, each Person that has held, holds or may hold a Claim or at any time was a creditor of the Debtor and that does not vote on the Plan or votes against the Plan, in each case will be deemed to forever release, waive and discharge all Claims, obligations, suits, judgments, damages, demands, rights, causes of action and liabilities (other than the right to enforce the Debtor's obligations under the Plan and the contracts, instruments, releases, agreements and documents delivered under the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Bankruptcy Case or the Plan that such entity has, had or may have against the Debtor, the Debtor's estate, and their assets.

8.4     **Third Party Release.**  There are <u>no</u> non-consensual third party releases under the Plan.  However, provided Mr. Barlow remains with the Debtor under the Plan, each holder of a Claim that votes in favor of the Plan and affirmatively consent to third party release, then such claimant will be deemed to forever release, waive and discharge all Claims, obligations, suits, judgments, damages, demands, rights, causes of action and liabilities (other than the right to enforce the Debtor's obligations under the Plan and the contracts, instruments, releases, agreements and documents delivered under the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other occurrence taking place on or prior to the Effective Date in any

way relating to Mr. Barlow and/or Mr. Garrett that such entity has, had or may have against Mr. Barlow and/or Mr. Garrett and their assets.

8.5 **Exculpation.** Except as otherwise set forth in the Plan, neither the Debtor, nor any of its respective present or former members, officers, directors, employees, general or limited partners, advisors, attorneys, agents, successors or assigns, including the Subchapter V Trustee, shall have or incur any liability to any holder to a Claim, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successor or assigns, for any act or omission in connection with, relating to, or arising out of, the administration of the Chapter 11 bankruptcy proceeding, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, including, but not limited to, any Exit Financing. Nothing in this Section 9.5 of the Plan shall relieve any of the foregoing parties from carrying out their responsibilities, if any, under the Plan and such exculpation shall not apply to any liability for acts or omissions involving gross negligence or willful misconduct.

8.6 **Cancellation of Existing Indebtedness and Liens.** Upon entry of an order of discharge pursuant to Section 9.1 of the Plan: to the extent applicable,  (a) all credit agreements, promissory notes, mortgages, security agreements, invoices, contracts, agreements and any other documents or instruments evidencing Claims against the Debtor, together with any and all Liens securing same, shall be canceled, discharged, and released without further act or action by any Person under any applicable agreement, law, regulation, order or rule, (b) the obligations of the Debtor thereunder shall be deemed cancelled, discharged, and released, and (c) all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens or other security interests, including any rights to any collateral thereunder, will revert to the Debtor to the extent of applicable law and subject to the Plan.

### Article 9:    ARTICLE XI: GENERAL AND OTHER PROVISIONS

9.1 **Plan Confirmation Hearing; Objection Deadline**. The Bankruptcy Court will schedule a hearing on confirmation of the Plan and to consider whether the Plan satisfies the various requirements of the Bankruptcy Code.  Any objection to the Plan shall be filed by the objection deadline to be indicated in a separate notice or Order of the Bankruptcy Court.

9.2 **Voting on the Plan.**  All creditors with Allowed Claims and Interests entitled to vote on the Plan, Class 1 (Other Priority Claims), Class 3 (Fifth Third Bank Loan), Class 4 (Other Secured Loans), Class 5 (General Unsecured Claims) may cast their votes for or against the Plan by completing, dating, signing and causing the ballot, to be returned to the Debtor's counsel by the voting deadline to be indicated in a separate plan filing notice or Order of the Bankruptcy Court.

9.3 **Plan Acceptance / Rejection Standard**. Pursuant to section 1126 of the Bankruptcy Code, an impaired class of Claims shall have accepted the Plan if (a) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan, and (b) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan (in both instances, acceptance or rejection by the creditor to be in good faith).  If necessary and applicable for confirmation of

the Plan, the Debtor reserves the right to request that the Bankruptcy Court address whether the Plan may be deemed accepted or rejected by any impaired Class that does not vote.[5]

9.4     **Consensual / Nonconsensual Confirmation.** Pursuant to section 1191(a) of the Bankruptcy Code, the Bankruptcy Court shall confirm the Plan if all applicable requirements of section 1129(a) are met.  Under section 1191(b) of the Bankruptcy Code, if all of the applicable requirements of section 1129(a) are met other than 1129(a)(8) (each class of claims or interests to accept the plan if impaired) and 1129(a)(10) (if a plan has impaired class of claims, at least one class of claims to accept the plan), the Bankruptcy Court  may still confirm the Plan if the Plan does not discriminate unfairly, and is fair and equitable (See Sections 8.2 and 8.3 of the Plan).

There are five impaired classes under the Plan: Class 1 (Other Priority Claims), Class 3 (Fifth Third Bank Loan), Class 4 (Other Secured Loans), Class 5 (General Unsecured Claims). In the event holders of Claims in any such Classes vote to accept the Plan by the requisite majority provided in section 1126(c) of the Bankruptcy Code, section 1129(a)(10) will be satisfied.  Section 1129(a)(8) will be satisfied if all impaired classes of Claims or Interests vote to accept the Plan.  If the requirements of both sections 1129(a)(8) and (a)(10) are met, the Debtor will seek confirmation of the Plan pursuant to section 1191(a) of the Bankruptcy Code. Otherwise, the Debtor will seek confirmation of the Plan pursuant to section 1191(b) of the Bankruptcy Code.

9.5     **Best Interest Test and Liquidation Alternative**

Section 1129(a)(7)(A)(ii) of the Bankruptcy Code requires that each holder of a claim or an interest in an impaired class of claims must either accept the Plan or receive or retain at least the amount or value it would receive if the Debtor's assets were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date of the Plan.  The Debtor believes that this requirement is satisfied under the Plan.  Pursuant to sections 1129(a)(7) and 1190(1)(B) of the Bankruptcy Code, a Liquidation Analysis.  Creditors will receive under the Plan more than the amount they would have received if the Debtor's assets were liquidated.

In addition, if the case is converted to Chapter 7 a trustee would be appointed which would result in additional administrative costs as the Chapter 7 trustee would need to hire new professionals to analyze and liquidate the Debtor's assets.  The conversion would result in the

---

[5] Courts have adopted the view that although actual acceptance of a plan by at least one class of impaired claims is necessary for a bankruptcy court's confirmation of a plan under section 1129(a)(10), not every creditor is obligated to vote on a plan.  See, 11 U.S.C. § 1126(a) (a creditor "may" accept or reject a plan).  See, In re Ruti-Sweetwater, Inc., 836 F.2d 1263, 1266 (10th Cir. 1988) (holding that creditor's inaction constituted an acceptance of the plan; a plan is not only presumed confirmable, but is confirmable under § 1129(a) or 1129(b) where only one class of impaired claims has accepted the plan and the other elements of § 1129(a) or §1129(b) are met); In re Cypresswood Land Partners, I, 409 B.R. 396, 430 (Bankr. S.D. Texas 2009) (adopted the view in In re Ruti-Sweetwater and acknowledged the disagreement between courts as to whether a creditor's failure to vote or to object to a plan constitutes acceptance of the plan).  But see, In re M. Long Arabians, 103 B.R. 211, 215-216 (BAP 9th Cir. 1989) (holding that the holder of a claim must affirmatively accept the plan).  Courts in the First Circuit have cited to In re Ruti-Sweetwater but the First Circuit has not addressed this issue.  See, In re Boston Hotel Venture, LLC, 460 B.R. 38, 51 (Bankr. D. Mass. 2011), *vacated on other grounds*, 2012 WL 4513869 (BAP 1st Cir. November 14, 2011) (impaired class that did not vote was deemed to have accepted the plan); In re Fi li, 257 B.R. 370, 373 (BAP 1st Cir. 2001) (citing to In re Ruti-Sweetwater in the context of res judicata effect, stating that chapter 11 plan's discharge provisions bound non-voting, non-objecting creditor with notice).

establishment of a new bar date and would require the new trustee to re-analyze the claims filed against the Debtor.

### 9.6    **Plan Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that the Plan be feasible (that is, that there be a reasonable prospect that the Debtor will be able to perform its obligations under the Plan without further financial reorganization).  As set forth in Section 8.1 above, the sources of payments under the Plan will be (i) available cash or working capital, (ii) cash flow from ongoing business operation, (iii) Disposable Income, if any, (iv) proceeds from Potential Litigation and Avoidance Actions, if any, and (v) the Exit Financing.

As particularly noted, absent agreements with holders of Priority Tax Claims or successful objections with respect to such Claims it is unlikely the reorganization of the Debtor will be feasible, thereby requiring a potential sale or liquidating plan to the extent feasible.  The Debtor's counsel believes such a resolution is feasible as absent such an agreement anywhere from 40 to 110 jobs will be at stake as will be the health and other benefits which accrued during COVID when the Debtor attempted to keep its union workers paid despite the shuttering of the economy.

While the net cash flow may be insufficient to have Disposable Income, the Debtor expects the business to have enough revenue to cover the operating business expenses, and other payments contemplated under the Plan going forward.  Pursuant to section 1190(1)(C) of the Bankruptcy Code the Debtor will submit financial projections for the next five years and the Debtor's proposed Plan distributions (subject to funding of the DIP Loan, the Debtor acquiring the necessary bonds, and the union workers' return to the job sites, thereby permitting the Debtor to make a more exacting financial forecast).

### 9.7    **Tax Consequences.** The Debtor has not requested a ruling from the Internal Revenue Service with respect to these matters and no opinion of counsel has been sought or obtained by the Debtor with respect thereto.  There can be no assurance that the Internal Revenue Service or any state or local taxing authorities will not challenge any or all of the tax consequences of the Plan, or that such a challenge, if asserted, would not be sustained.  FOR THE FOREGOING REASONS, CREDITORS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE SPECIFIC TAX CONSEQUENCES (FOREIGN, FEDERAL, STATE AND LOCAL) TO THEM OF THE PLAN. THE DEBTOR IS NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY CREDITOR OR EQUITY HOLDER, NOR IS THE DEBTOR RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.  THE DEBTOR HAS AND SHALL RETAIN ITS SUBSTANTIAL NON OPERATING LOSS.

### 9.8    **Reservation of Rights**. The Debtor reserves the right to, among other things, (i) contest the right of the holder of any Claim to vote on the Plan, or designate the vote of the holder of any Claim (ii) contest the right of the holder of any Claim to receive distributions under the Plan, (iii) contest the validity of a creditor's Lien or security interest, (iv) seek to subordinate

any Claim for inequitable conduct or otherwise, and (iv) to pre-pay all or any portion of an Allowed Claim, through refinancing, additional exit financing or otherwise. Except as otherwise provided, no assets shall be deemed abandoned and no defense, set-off, counterclaim or right of recoupment of the Debtor shall be deemed waived, released or compromised.

9.9     **Substantial Consummation; Case Closure.** If the Plan is confirmed pursuant to section 1191(a), the role of the Subchapter V Trustee will be terminated, pursuant to section 1183(c)(1), after the filing of a notice of substantial consummation of the Plan by the Subchapter V Trustee. Upon substantial consummation of the Plan, the Debtor or the Subchapter V Trustee shall (i) file the notice required under section 1183(c)(2) (ii) file a motion for the case to be closed and for final decree pursuant to the Local Rules of the Northern District of Illinois, and (iii), if required, file a motion or request for entry of discharge under section 1192 of the Bankruptcy Code.

9.10    **Risks Associated With Plan Distributions**. Distributions under the Plan rely on the Debtor's revenue going forward and mitigation of the priority tax claims. The Subchapter V Trustee may not be able to make the projected distributions under the Plan in the event the actual revenue numbers do not reach the projected amounts during the five-year term of the Plan, or if actual operating expenses are more than the projected amounts, including with respect to price of materials, shipping costs, and labor costs. Other events that could affect proposed distributions under the Plan, particularly to Class 5 (General Unsecured Claims) include:

(i) if there is a material increase in Administrative Expense Claims due to further litigation or otherwise;

(ii) if the substantial Priority Tax Claims are not substantially mitigated;

(iii) if substantial Other Priority Claims are not substantially mitigated;

(iv) if recovery actions are pursued but the bankruptcy estate does not recover sufficient proceeds from Potential Litigation, and/or Avoidance Actions;

(v) if the Debtor is not able to timely refinance or pay the DIP Loan;

(vi) if the Debtor is not able to close the Exit Financing

(vii) if any downturn in the construction industry during the term of the Plan;

(viii) any further restrictions during the term of the Plan due to any pandemic, including Covid-19; or

(ix) general contractors impose penalties for delays in obtaining the bonds or union workers not returning to such projects.

9.11    **Conditions Precedent to the Effective Date**. The following conditions must be fully satisfied or waived for the Plan to become effective (the "**Effective Date**"):

(a)     The Confirmation Order shall have been entered by the Bankruptcy Court.

(b)      The Exit Financing shall have been approved by the Bankruptcy Court.

(c)      The loan documents for the Exit Financing shall have been signed and funding shall have occurred.

9.12   **Waiver of Conditions to the Effective Date.**   The conditions set forth in Sections 10.11(b), or 10.11(c)  may be waived in whole or part in writing by the Debtor and the Investor at any time without an order of the Bankruptcy Court.

9.13   **Effect of Non-occurrence of Effective Date**. If the Effective Date does not occur within 60 days after entry of the Confirmation Order, the Plan shall be null and void in all respects and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against the Debtor, or (b) prejudice in any manner the rights of the Debtor, or constitute an admission, acknowledgement, offer or undertaking by the Debtor.

9.14   **Severability.**   If any provision in the Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

9.15   **Binding Effect.**   The rights and obligations of any Person named or referred to in the Plan will be binding upon, and will inure to the benefit of the successors or assigns of such Person.

9.16   **Captions.**   The headings contained in the Plan are for convenience of reference only and do not affect the meaning or interpretation of the Plan.

9.17   **Controlling Effect.** Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, or to the extent the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the state of Illinois, without giving effect to the principles of conflicts of law of such jurisdiction.

9.18   **Corporate Governance.**   Upon information and belief, the Debtor's organizational documents do not provide for issuance of non-voting equity securities or any preferred class of equity securities, as referred to under section 1123(a)(6) of the Bankruptcy Code, to the extent applicable.

9.19   **Retention of Jurisdiction**.  Pursuant to sections 105(a) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Plan, the Confirmation Order, any Exit Financing, and the Bankruptcy Case to the fullest extent permitted by law.

9.20   **Exhibits**. The Debtor reserves the right to modify or amend any of the Exhibits or to add new Exhibits to the Plan as supplement by filing a notice to that effect.

9.21    **Amendment or Modification of the Plan**. The Debtor shall be permitted to amend, supplement, or modify the Plan at any time, so long as such amendment, supplement, or modification satisfies the restrictions and requirements in section 1193 of the Bankruptcy Code.

9.22    **Notice to Subchapter V Trustee**. All communications with the Subchapter V trustee, including related to the Plan, Claims, notices, and address changes should be sent to the following mailing address:
William B. Avellone, Subchapter V Trustee
100 S. Saunders Rd., Suite 150
Lake Forest, IL 60045.

## Article 10:      ARTICLE IX: DEFINITIONS

10.1    **Definitions and Rules of Construction.**  The definitions and rules of construction contained in sections 101 and 102 of the Bankruptcy Code shall apply when the terms defined or construed in the Bankruptcy Code are used in the Plan but not defined.  For purposes of the Plan, the following terms shall have the meanings specified herein:

"Administrative Expense Claim" shall means any cost or expense of administration of the Bankruptcy Case arising on or before the Effective Date allowable under section 503(b) or 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary post-petition expense of preserving the Debtor's estate or operating the business, all Professional Fee Claims, all to the extent not properly paid previously by the Debtor in the ordinary course or pursuant to Bankruptcy Court order.

"Allowed" shall mean any Claim against the Debtor (a) for which (i) a proof of claim was timely and properly filed or, if no proof of claim was filed, the Claim is listed by the Debtor in the Schedules as liquidated in amount and not disputed or contingent (and for which no contrary proof of claim has been filed), or unliquidated and (ii) no objection to the allowance of the Claim (including without limitation an objection based on rights of set off or recoupment, or under sections 502(d), 510 or 549 of the Bankruptcy Code) or request to estimate the Claim has been interposed on or before the Claims Objection Deadline, or if any timely objection or request for estimation has been interposed, such Claim has been determined by a final order to be allowed in favor of the respective Claim holder (in which case the Allowed Claim shall equal the allowed amount as determined by such final order); (b) that is allowed pursuant to the terms of an agreement by and between the holder of such Claim and the Debtor; or (c) that is allowed by final order or under the terms of the Plan.

With respect to Administrative Expense Claim, "Allowed" shall mean any Administrative Expense Claim, or any portion thereof, with respect to which both (i) a timely and proper request for payment has been made to the extent required by the Plan, the Confirmation Order, or by any other order of the Bankruptcy Court, and (ii) such Administrative Expense Claim is allowed by the Bankruptcy Court.

Allowed Claims shall not include Disputed Claims or Disallowed Claims.  All non-compensatory penalties, fines, punitive damages, exemplary damages, multiple damages, any liquidated damages, or any other claims or obligations that do not compensate for actual

losses incurred shall be deemed subordinated to General Unsecured Claims or disallowed under sections 105(a) and 726(a)(4) of the Bankruptcy Code or otherwise.

"Avoidance Actions" shall mean any avoidance claims or powers held by the Debtor or any trustee for the Debtor, including those avoidance powers set forth in sections 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code, or to the proceeds of any related claims, or actions commenced pursuant to such powers.  For the avoidance of doubt, the Avoidance Actions shall not be subject to any Lien.

~~"Bank" shall mean Fifth Third Bank.~~

 "Bankruptcy Case" shall mean the Debtor's Chapter 11 bankruptcy case pending in the Bankruptcy Court, Case No. 22-10945 (TAB).

"Bankruptcy Code" shall mean Title 11 of the United States Code, 11 U.S.C. §§101 et seq., as amended from time to time.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Northern District of Illinois in which the Bankruptcy Case is pending.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure as promulgated under 28 U.S.C. § 2075, and any local rules of the Bankruptcy Court.

"Cash Advance Lenders" shall mean certain creditors with purported cash advance agreements, as set forth in Section 1.2 of the Plan.

"Cash Collateral Motion" shall have the meaning set forth in Section 1.6 of the Plan.

 "Claim" shall mean a claim against a Person or its property as defined in section 101(5) of the Bankruptcy Code, including, without limitation, (a) any right to payment, whether or not such right is reduced to judgment, and whether or not such right is liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) any right to an equitable remedy for breach of performance, if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, or is fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

"Claims Objection Deadline" means the later of (i) sixty days after the Effective Date, and (ii) such greater period of limitation for the filing of an objection to any Claim as may be fixed or established by the Bankruptcy Court or by agreement between the Debtor and the Claim holder.

"Confirmation Date" shall mean the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket in this Bankruptcy Case.

"Confirmation Order" shall mean the order of the Bankruptcy Court confirming the Plan pursuant to the provisions of the Bankruptcy Code, and any supplementary orders of the Bankruptcy Court issued in furtherance of the Plan.

"<u>Debtor</u>" shall have the meaning set forth in the preamble to the Plan, and shall include the confirmed Debtor after the Effective Date of the Plan, as applicable.

"<u>DIP Credit Agreement</u>" shall have the meaning set forth in Section 1.7 of the Plan.

"<u>DIP Financing Motion</u>" shall have the meaning set forth in Section 1.7 of the Plan.

"<u>DIP Lender</u>" shall have the meaning set forth in Section 1.7 of the Plan.

"<u>DIP Loan</u>" shall have the meaning set forth in Section 1.7 of the Plan.

"<u>Disallowed Claim</u>" shall mean (a) any Claim that has been disallowed or expunged by a final order; (b) any Claim that has been listed by the Debtor in the Schedules in the amount of "$0" or as unliquidated in amount, disputed, contingent, or unknown and for which a bar date has been established but no proof of claim has been timely filed; or (c) unless otherwise specified herein or by order of the Bankruptcy Court, any interest, fees and other charges, fines, penalties, multiple or punitive damages.

"<u>Disposable Income</u>" shall mean the "disposable income" of the Debtor as defined under section 1191(d) of the Bankruptcy Code.  The Debtor's projected Disposable Income is calculated under ***Exhibit B*** attached to the Plan.  For the avoidance of doubt, Disposable Income shall not include any Employee Retention Credit (ERC) tax credit.

"<u>Disputed Claim</u>" shall mean: (i) all or the portion of any Claim against the Debtor that is neither an Allowed Claim nor Disallowed Claim, including any Claim as to which the Debtor interposed an objection or request for estimation on or before the Claims Objection Deadline, which objection or request for estimation has not been withdrawn or determined by a final order; (ii) a Claim as to which the holder of such  Claim is a defendant in a pending Avoidance Action, or has failed to pay or turn over property as required by section 502(d) of the Bankruptcy Code; or (iii) a Claim that is otherwise treated as a "Disputed Claim" pursuant to the Plan, or scheduled as disputed, contingent, or unliquidated.

"Effective Date" shall mean the date upon which all of the conditions precedent to the Effective Date of the Plan, as set forth in Section 10.11, shall have been satisfied or waived (to the extent subject to waiver).

"<u>Exit Financing</u>" shall have the meaning set forth in Section 8.2 of the Plan.

"<u>Fifth Third Bank Loan</u>" shall have the meaning set forth in Section 1.4(A) of the Plan.

"<u>General Unsecured Claim</u>" shall mean a Claim against the Debtor, including any trade vendor claim, that is not an Administrative Expense Claim, a Priority Tax Claim, or a Claim under Classes 1-5.  General Unsecured Claims shall include (i) Non-Priority Tax Claims, if any, (ii) the deficiency amount of any Secured Claim, and (iii) any wholly unsecured Claims, including the PPP Loan, and any Claims of Cash Advance Lenders, in each case if applicable.

"<u>IDES</u>" shall have the meaning set forth in Section 1.4(E) of the Plan.

"Interests" means any equity or membership interest in the Debtor, whether in the form of common or preferred stock, stock options, warrants, partnership interests, membership interests, any other right to purchase or otherwise receive any ownership interest in the Debtor, or other interest or related right to payment or compensation based upon such interest, existing on or before the Effective Date.

"Investor" means DB SPV I, LLC, a Louisiana Limited Liability Company, which is also the DIP Lender, or affiliates thereof and/or other lenders to be designated by DB SPV I, LLC with respect to the Exit Financing.

"Kiewit" shall have the meaning set forth in Section 1.8 of the Plan.

"Kiewit Stay Relief Motion" shall have the meaning set forth in Section 1.8 of the Plan.

"Kiewit Subcontract" shall have the meaning set forth in Section 1.8 of the Plan.

"Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code and shall include all writs of attachment, and lis pendens; except that (a) a lien that has been avoided in accordance with sections 544, 545, 546, 547, 548, 549 or 553 of the Bankruptcy Code shall not constitute a Lien, and (b) no lien shall be valid unless approved by a final order or by agreement of the Debtor.

"LLMCC" shall have the meaning set forth in Section 1.8 of the Plan.

"Loan Documents" means the loan documents for the Exit Financing.

"Local 9" shall have the meaning set forth in Section 1.8 of the Plan.

"Local 26" shall have the meaning set forth in Section 1.8 of the Plan.

"Local 26 Parties" shall have the meaning set forth in Section 1.8 of the Plan.

"Local 63" shall have the meaning set forth in Section 1.8 of the Plan.

"Local 134" shall have the meaning set forth in Section 1.8 of the Plan.

"Mass Electric" shall have the meaning set forth in Section 1.8 of the Plan.

"Mass Electric Stay Relief Motion" shall have the meaning set forth in Section 1.8 of the Plan.

"Mass Electric Subcontract" shall have the meaning set forth in Section 1.8 of the Plan.

"Mr. Barlow" shall be Dwayne Barlow, a shareholder and officer of the Debtor.

"Mr. Garrett" shall be Ben Garrett, a shareholder and officer of the Debtor.

"Non-Priority Tax Claims" means any Claim of a governmental unit not entitled to priority pursuant to section 507(a) of the Bankruptcy Code.

"Other Priority Claims" means an allowed Claim entitle to priority under section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim or Priority Tax Claim.

"Other Secured Loans" means certain vehicle related loans and equipment loans.

"Pension Funds" shall have the meaning set forth in Section 1.4(G) of the Plan.

"Person" shall mean any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated association or organization, governmental agency or political subdivision.

"Petition Date" shall have the meaning set forth in the case background section of the Plan.

"Plan" shall mean the *(Modified) Fourth Amended Chapter 11 Plan of Reorganization For Small Business Debtor Under Subchapter V*, including, without limitation, any Exhibits and any plan supplement documents, as the same may be altered, amended or modified from time to time.

"PNC Bank" means PNC Bank, National Association (a/k/a PNC Equipment Finance, LLC) as assignee for Altec Capital Services.

"Potential Litigation" shall have the meaning set forth in Section 1.9 of the Plan.

"PPP Loan" shall have the meaning set forth in Section 1.2 of the Plan.

"Priority Tax Claims" shall mean any Claim of a governmental unit entitled to priority under section 507(a)(8) of the Bankruptcy Code.

"Professional Fee Claims" shall mean the fees and expenses of professionals (employed pursuant to sections 327 and 1183 (a) of the Bankruptcy Code) under sections 328, 329, 330, 331, 503, 507(a) or 1191(e) of the Bankruptcy Code approved by an Order of the Bankruptcy Court.

"Remaining Funds" shall mean the Debtor's Disposable Income, if any, (ii) any portion of the proceeds from Potential Litigation (as permitted to be used by the DIP Lender for distribution to other creditors under the Plan), and (iii) any proceeds of Avoidance Actions.  For the avoidance of doubt, Remaining Funds shall not include any Employee Retention Credit (ERC) tax credit which is the security or collateral of the Investor and shall not be subject to any set off.

"SBA" shall mean U.S. Small Business Administration.

"Schedules" shall mean the bankruptcy schedules of assets and liabilities and the statements of financial affairs filed by the Debtor under section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules, lists and statements may be supplemented or amended from time to time.

"Secured Claim" shall mean any Claim that is secured by a Lien on property to the extent of the value of such property, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is a claim of setoff under section 553 of the Bankruptcy Code, to the extent of such setoff.

"SOFA" shall mean the Statement of Financial Affairs of the Debtor, filed by the Debtor, as such schedules, lists and statements may be supplemented or amended from time to time.

"Stock Transfer Transaction" shall have the meaning set forth in Section 8.9 of the Plan.

"Subchapter V Trustee" shall have the meaning set forth in the case background section of the Plan.

"Wage Order"" shall have the meaning set forth in Section 1.8 of the Plan.

Respectfully Submitted,


THE BARTECH GROUP OF ILLINOIS, INC.

By:_____
Name: Dwayne Barlow
Title: President

RIEMER & BRAUNSTEIN LLP
*Counsel to The BarTech Group of Illinois,
Inc.*


/s/ Alan L. Braunstein
Alan L. Braunstein, Esq.
RIEMER & BRAUNSTEIN LLP
100 Cambridge Street, 22nd Floor
Boston, Massachusetts  02108
Tel: (617) 523-9000
abraunstein@riemerlaw.com

Phillip J. Bock
71 South Wacker, Suite 3515
Chicago, Illinois 60606
Tel: (312) 780-1173
pblock@riemerlaw.com


DATED: ~~May~~June _____, 2023

### *EXHIBITS*[6]

*The Debtor reserves the right to modify or amend any of the Exhibits or to add new Exhibits to the Plan as supplement by filing a notice to that effect.*

Exhibit A: Liquidation Analysis
Exhibit B: Financial Projections (with proposed or potential Disposable Income Calculation)
Exhibit C: Prepetition Claims Analysis
Exhibit D: Accrued Administrative Expense Claims

Exhibit E: Retainage List
Exhibit F: Signed Term Sheet for Exit Financing
Exhibit G: List of Unions
Exhibit H: Potential executory contracts/ unexpired leases to be assumed (with cure costs)

~~3625334.1~~
3625334.3

---

[6] The Debtor reserves the right to modify or amend any of the Exhibits or to add new Exhibits to the Plan by filing a notice to that effect with the Bankruptcy Court.

Document comparison by Workshare 10.0 on Tuesday, June 6, 2023 6:11:36 PM

| Input: | |
|---|---|
| Document 1 ID | iManage://BOSDMS/IMAN1/3625334/1 |
| Description | #3625334v1<IMAN1> - BarTech - Fourth Amended Chapter 11 Plan of Reorg (Small Business Debtor) |
| Document 2 ID | iManage://BOSDMS/IMAN1/3625334/3 |
| Description | #3625334v3<IMAN1> - BarTech - MODIFIED Fourth Amended Chapter 11 Plan of Reorg (Small Business Debtor) |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 123 |
| Deletions | 74 |
| Moved from | 1 |
| Moved to | 1 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 199 |

EXHIBIT C
**Prepetition Claims[1]**

(as of ~~4/13/23~~6/6/23)

**The BarTech Group of Illinois, Inc. – Chapter 11 Plan of ~~Liquidation~~Reorganization**

| Priority Tax Claims[2] | CREDITOR | FILED/ SCHEDULED CLAIMS[3] | PROPOSED PLAN CLAIM AMOUNT | NOTES |
|---|---|---|---|---|
| | Comptroller of the Treasury- Maryland | $40,300.00 | $40,300.00 | |
| | Delaware Department of Labor | $222.75 | $222.75 | Scheduled amount |
| | Delaware Withholding Tax | $3,021.36 | $3,021.36 | Scheduled amount |
| | IRS - Electronic Federal Tax Payment | $2,465,097.53 | $2,465,097.53 | |
| | Illinois Department of Employment Security | $26,013.52 | $26,013.52 | Claim number 3-2 is filed as a secured claim in the amount of $66,877.08, as a priority 507(a)(8) in the amount of $26,013.52 and as a unsecured |

[1] **All claims or amounts are subject to allowance and claims objection process under the Bankruptcy Code.** This list may not include any claim that may be filed pursuant to section 502(g) (rejection of executory contracts and unexpired leases), and section 502(h) (claim based on recovery of property), if applicable.

[2] The governmental bar date is March 22, 2023 under section 502(b)(9) of the Bankruptcy Code.

[3] The amounts listed are filed claim, unless noted otherwise.

| | | | | |
|---|---|---|---|---|
| | | | | in the amount of $865.00. **Asserted secured portion is treated as unsecured subject to claim objection.** |
| | Illinois Department of Employment Security | ~~$41,957.40~~$39,674.66 | ~~$41,957.40~~$39,674.66 | Amended proof of claim #16 (~~4/13/23~~5/23/23) |
| | Illinois Department of Revenue | $161,617.64 | $161,617.64 | |
| | Pennsylvania Dept. of Revenue | $2,066.72 | $2,066.72 | Scheduled amount |
| | Virginia State Withholding | $47,111.02 | $47,111.02 | Scheduled amount |
| | **TOTAL** | | **$2,787,407.94** | |
| | | | | |
| **Other Priority Claims** | CREDITOR | FILED/ SCHEDULED CLAIMS[4] | PROPOSED PLAN CLAIM AMOUNT | NOTES |
| | Local 63- Architectural Iron Workers | $163,795.98 | $163,795.98 | |
| | Electrical Insurance Trustees | $55,657.43 | $55,657.43 | |
| | IBEW Local 701 Fringe Benefit | $53,190.24 | $53,190.24 | |
| | Iron Workers Local | $69.00 | $69.00 | |

[4] The amounts listed are filed claim, unless noted otherwise.

|  | Union #444 |  |  |  |
|---|---|---|---|---|
|  | IWDC Benefit & Pension Plan | $14,267.00 | $14,267.00 | Scheduled amount |
|  | Local 26 IBEW –NECA Joint Trust | $161,603.14 | $161,603.14 |  |
|  | Local 9 IBEW & Outside | $152,812.07 | $152,812.07 |  |
|  | Iron Workers Mid-America SMA Fund | $3,208.87 | $3,208.87 |  |
|  | Iron Workers Mid-America Pension Fund | $6,105.04 | $6,105.04 |  |
|  | National Electrical Ben. Fund 134 | $10,819.89 | $10,819.89 | Scheduled amount |
|  | National Electrical Ben. Fund 701 | $2,775.13 | $2,775.13 | Scheduled amount |
|  | National Electrical Ben. Fund 9 | $3,646.66 | $3,646.66 | Scheduled amount |

| | Will and Grundy Industry Advancement Trust Fund | $12.42 | $12.42 | |
|---|---|---|---|---|
| | **TOTAL** | | **$627,962.87** | |
| | | | | |
| **Secured Claims – Conventional Loans** | CREDITOR | FILED/ SCHEDULED CLAIMS[5] | PROPOSED PLAN CLAIM AMOUNT | NOTES |
| | Altec Capital Services, LLC | See PNC Bank | See PNC Bank | See PNC Bank |
| | Anixter | See Unsecured Claims | See Unsecured Claims | |
| | Caterpillar Financial Services Corp. | $24,670.20 | $24,670.20 | |
| | Fifth Third Bank | $820,949.23 | $820,949.23 | |
| | Illinois Department of Employment Security | See Unsecured Claims | See Unsecured Claims | Proof of Claim filed as secured, priority, and unsecured |
| | Libertas Funding | $64,285.00 (disputed) | $0 | Scheduled as disputed $64,285.00; no proof of claim filed. |
| | PNC Bank/ PNC Equipment Finance LLC (assignee of Altec Capital) | See General Unsecured Claims | | See General Unsecured Claims – potential lease assumption |
| | Runnion Equipment Company | See General Unsecured Claims | | See General Unsecured Claims – potential lease assumption |
| | **TOTAL** | | **$845,619.43** | |
| **Other Secured Claims – Financed Vehicles** | CREDITOR | FILED/ SCHEDULED | PROPOSED PLAN CLAIM | NOTES |

[5] The amounts listed are filed claim, unless noted otherwise.

| | | CLAIMS[6] | AMOUNT | |
|---|---|---|---|---|
| | Ally Bank | $14,682.90 | $14,682.90 | 2020 Ford Edge vin# xxx6117 |
| | Ally Bank | $15,159.71 | $15,159.71 | 2018 Ford F-150 vin#xxx4550 |
| | Ally Bank | $12,912.76 | $12,912.76 | 2019 Ford Ranger Extended Cab vin #xxx6300 |
| | Ally Bank | $14,047.40 | $14,047.40 | 2019 Ford F-250 Super Suty Crew Cab XL vin#xxx0099 |
| | Ally Bank | $17,273.17 | $17,273.17 | 2019 Ford F-150 Cab XL vin #xxx8252 |
| | Ally Bank | $13,528.65 | $13,528.65 | 2019 Ford Transit Van 250 vin#xxx5324 |
| | Ally Bank | $10,618.24 | $10,618.24 | Scheduled amount<br><br>2018 Ford F-150 vin#xxx2783 |
| | Ally Bank | $4,516.53 | $4,516.53 | Scheduled amount<br><br>2016 Carringe Trailer vin#xxx5850 |
| | Ally Bank | $2,300.00 | $2,300.00 | Scheduled amount<br><br>2019 Ford Extended Cab |

---

[6] The amounts listed are filed claim, unless noted otherwise.

|  | Ally Bank | $15,333.33 | $15,333.33 | Scheduled amount<br><br>Chassis 2007 LAtec trailer vin#xxx0005 |
|--|--|--|--|--|
|  | Ally Bank | $2,603.70 | $2,603.70 | Scheduled amount<br><br>2016 Morris Carringe Trailer vin#5850 |
|  | Ally Bank | $2,878.35 | $2,878.35 | Scheduled amount<br><br>2018 Morris Trailer vin#xxx2312 |
|  | Ally Bank | $12,666.67 | $12,666.67 | Scheduled amount<br><br>2014 Dodge vin#xxx7397 |
|  | Ford Motor Credit Company LLC | $31,470.35 | $31,470.35 | 2020 Ford F-150; VIN # xxx6823 |
|  | Mercedes Benz of Orland Park | $39,323.62 | $39,323.62 | 2011 Mercedes- Benz G55K |
|  | **TOTAL** |  | **$209,311.38** |  |

| General Unsecured Claims | CREDITOR | FILED/ SCHEDULED CLAIMS[7] | PROPOSED PLAN CLAIM AMOUNT | NOTES |
|---|---|---|---|---|
| | Accident Fund | $16,259.60 | $0 | Scheduled amount<br><br>Scheduled as disputed; no proof of claim filed. |
| | ADT | $142.94 | $142.94 | Scheduled amount |
| | Advance Electrical Supply | $1,517.59 | $1,517.59 | Scheduled amount |
| | Advanced Solutions & Controls | $154.59 | $154.59 | Scheduled amount |
| | Ahern Rental | $17,538.92 | $17,538.92 | Scheduled amount |
| | Amplified Recruiting | $1,999.00 | $1,999.00 | Scheduled amount |
| | Anixter Inc. | $68,016.77 | $68,016.77 | Claim 36 filed as a secured claim in the amount of $53,357.05 and as unsecured in the amount of $14,659.72. **All amounts to be treated as unsecured subject to claim objection** |
| | Architectural Iron Workers | $106,749.28 | $106,749.28 | |
| | Badger Daylighting Corp | $4,251.28 | $4,251.28 | Scheduled amount |
| | Chicago Cut Concrete | $2,100.00 | $2,100.00 | Scheduled amount |

[7] The amounts listed are filed claim, unless noted otherwise.

| | Cutting | | | |
|---|---|---|---|---|
| | Cintas | $717.78 | $717.78 | |
| | City Electric Supply | $7,127.56 | $7,127.56 | Scheduled amount |
| | Cobra Concrete Cutting | $1,940.00 | $1,940.00 | Scheduled amount |
| | Comed | $431.76 | $431.76 | Scheduled amount |
| | Comptroller of the Treasury- Maryland | $3,745.00 | $3,745.00 | |
| | Concentra | $77.00 | $77.00 | Scheduled amount |
| | Connexion | $96,084.20 | $11,658.01 (subject to Schedule amendment) | Scheduled amount |
| | Crescent Electric Supply | $6,490.20 | $6,490.20 | |
| | Custom Truck One Source | $7,150.00 | $7,150.00 | Scheduled amount |
| | Electrical Insurance Trustees | $11,131.48 | $11,131.48 | |
| | ERICO International Corporation | $6,235.95 | $6,235.95 | Scheduled amount |
| | Esscoe L.L.C. | $2,089.80 | $2,089.80 | Scheduled amount |

| | | | |
|---|---|---|---|
| | Evergreen Supply Company | $10,928.16 | $10,928.16 | |
| | Fastenal | $358.60 | $358.60 | |
| | Fifth Third Bank | $51,312.64 | $51,312.64 | |
| | FNH Ready Mix | $11,504.36 | $11,504.36 | Scheduled amount |
| | Foley Rents | $3,183.15 | $3,183.15 | Scheduled amount |
| | Fringe Benefit Fund Account | $20,292.64 | $20,292.64 | Scheduled amount |
| | George Williams | $296,000.00 | $296,000.00 | |
| | HERC Rentals, Inc. | $13,012.53 | $13,012.53 | |
| | Hilti Inc. | $2,686.01 | $2,686.01 | Scheduled amount |
| | Helsel – Jepperson | $2,305.29 | $0 (subject to claim objection) | |
| | Hurtt Fabricating Corporation | $186,225.00 | $0 (subject to Schedule amendment) | Scheduled amount |
| | IBEW Local #9 | $104,132.22 | $104,132.22 | Scheduled amount |
| | IBEW Local 701 Fringe Benefit | $124,323.34 | $124,323.34 | |
| | Illinois Department of Employment Security | $67,742.08 | $67,742.08 | Claim number 3-2 is filed as a secured claim in the amount of $66,877.08, as a priority 507(a)(8) in the amount of $26,013.52 and as a |

| | | | | unsecured in the amount of $865.00. **Asserted secured portion is treated as unsecured subject to claim objection.** |
|---|---|---|---|---|
| | Illinois Department of Revenue | $18,499.46 | $18,499.46 | |
| | Interstate Electronics Company | $9,318.00 | $9,318.00 | Scheduled amount |
| | Iron Workers District Council | $22,116.00 | $22,116.00 | Scheduled amount |
| | Iron Workers Local 498 | $1,410.93 | $1,410.93 | Scheduled amount |
| | Iron Workers Local 498 Pension | $3,379.63 | $3,379.63 | Scheduled amount |
| | Iron Workers Local Union #444 | $1,105.00 | $1,105.00 | |
| | Iron Workers Local Union #444 | $1,075.34 | $1,075.34 | |
| | Iron Workers Local Union 401 | $6,758.50 | $6,758.50 | Scheduled amount |
| | Iron Workers Mid-America SMA Fund | $27,030.42 | $27,030.42 | |
| | Iron Workers Mid-America Pension Fund | $26,112.99 | $26,112.99 | |

| | | | | |
|---|---|---|---|---|
| | Iron Workers Tri State Welfare | $2,700.18 | $2,700.18 | Scheduled amount |
| | Iron Workers Tri State Welfare | $5,231.85 | $5,231.85 | Scheduled amount |
| | IRS - Electronic Federal Tax Payment | $769,055.24 | $769,055.24 | |
| | IW District Council Phila & Vicinity H&W Fund aka Cleary Josem Trigiani LLP | $33,111.03 | $33,111.03 | |
| | J&J Maintenance Co. | $481.00 | $0 (subject to Schedule amendment) | Scheduled amount |
| | J Ave Development Inc. | $1,913.50 | $1,913.50 | Scheduled amount |
| | Jacks Inc. | $271.79 | $271.79 | Scheduled amount |
| | John Burns Construction Company | $Undetermined | $0 | |
| | JPMorgan Chase Bank N.A. | $11,182.38 | $0 (subject to claim objection) | |
| | Kencove Farm Fence | $14,843.47 | $0 (subject to Schedule amendment) | Scheduled amount |
| | L&C Enterprises –USA | $2,740.51 | $2,740.51 | Scheduled amount |

| | | | | |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| | LA Fasteners Inc. | $3,000.00 | $3,000.00 | Scheduled amount |
| | Landing Holdings, Inc. | $17,830.00 | $17,830.00 | Scheduled amount |
| | Local 26 IBEW –NECA Joint Trust | $15,473.09 | $15,473.09 | |
| | Local 451 Combine Funds | $5,312.19 | $5,312.19 | Scheduled amount |
| | Local 9 IBEW & Outside | $38,815.04 | $38,815.04 | |
| | Low Voltage Solutions Inc. | $19,625.32 | $19,625.32 | Scheduled amount |
| | Lustig & Wickert, P.C. | $2,195.00 | $2,195.00 | Scheduled amount |
| | Mid-America Fringe Benefit Fund | $9,471.88 | $9,471.88 | Scheduled amount |
| | Mobil Mini | $4,985.20 | $4,985.20 | Scheduled amount |
| | Nicor Gas | $1,436.59 | $0 (subject to claim objection) | |
| | Normandy Machine Co. | $67,280.00 | $67,280.00 | |
| | Owen Supply | $2,665.96 | $2,665.96 | Scheduled amount |
| | Perimeter Access System Service | $21,355.94 | $21,355.94 | Scheduled amount |
| | Physicians Immediate Care | $76.00 | $76.00 | Scheduled amount |
| | PNC Bank/ PNC Equipment | $296,388.20 | TBD for cure cost | Scheduled amount as secured for |

| | | | |
|---|---|---|---|
| | Finance LLC (assignee of Altec Capital) | | (if treated as lease versus secured transaction) | Altec Capital ($50,358); claim filed by PNC Bank ($296,388.20) as unsecured based on equipment lease/ finance transaction. |
| | Pro Access Systems | $16,082.78 | $8,380.54 (subject to Schedule amendment) | Scheduled amount |
| | Rails Company | $30,476.00 | $30,476.00 | |
| | Residence Inn – Heritage Inn | $66,626.62 | $66,626.62 | |
| | Ridge Fence Supply Inc. | $16,912.24 | $16,912.24 | Scheduled amount |
| | Riley Safer Holmes & Cancila | $2,772.00 | $2,772.00 | Scheduled amount |
| | Runnion Equipment Company | $11,370.00 | $11,370.00 | Claim 34 (amended 4/4/23) states claim amount is 11,370.00 based on lease/ cure cost. Per POC secured in the amount of $67,000.00 for 2019 Didge 5500 Truck vin#xxx5079. |
| | Safelite Fulfillment Inc. | $430.75 | $430.75 | Scheduled amount |
| | SIMCO Electronics | $1,215.78 | $1,215.78 | Scheduled amount |
| | Sound Incorporated | $28,136.00 | $28,136.00 | Scheduled amount |

| | | | | |
|---|---|---|---|---|
| | Stephens Pipe & Steel LLC | $280,657.72 | $221,395.44 (subject to Schedule amendment) | Scheduled amount |
| | Sunbelt Rentals | $393.85 | $393.85 | Scheduled amount |
| | Sunrise Electric | $1,492.20 | $1,492.20 | Scheduled amount |
| | TMS Supplies Inc. | $75,564.06 | $0 (subject to Schedule amendment) | Scheduled amount |
| | Toshiba Business Solutions | $1,173.60 | $1,173.60 | Scheduled amount |
| | Travelers | $2,202.00 | $2,202.00 | Scheduled amount |
| | Trimble Navigation Ltd | $2,212.60 | $2,212.60 | Scheduled amount |
| | Uline Inc. | $4,562.06 | $2,587.59 (subject to claim objection) | |
| | United Rentals (North America) | $401.88 | $401.88 | Scheduled amount |
| | US Small Business Administration | $1,801,685.00 | $0 | Scheduled amount<br><br>Scheduled as disputed; no proof of claim filed. |
| | Verizon | $2,039.75 | $0 (subject to Schedule amendment) | Scheduled amount |
| | W.W. Grainger Inc. | $1,083.54 | $1,083.54 | |
| | Wesco Distribution, Inc. | $4,618.80 | $4,618.80 | |

| | | | | |
|---|---|---|---|---|
| | Western Remac, Inc. | $664.40 | $664.40 | Scheduled amount |
| | Will and Grundy Industry Advancement Trust Fund | $99.00 | $99.00 | |
| | Williams Scotsman | $16,637.61 | $0 (subject to claim objection) | |
| | **TOTAL** | | $2,511,301.46 | Without claim of SBA (no proof of claim filed) |

3543736.9
3543736.10

Document comparison by Workshare 10.0 on Tuesday, June 6, 2023 5:31:58 PM

| Input: | |
|---|---|
| Document 1 ID | iManage://BOSDMS/IMAN1/3543736/9 |
| Description | #3543736v9<IMAN1> - Exhibit C for Ch 11 Plan (Prepetition claims / claim analysis) - BarTech |
| Document 2 ID | iManage://BOSDMS/IMAN1/3543736/10 |
| Description | #3543736v10<IMAN1> - Exhibit C for Ch 11 Plan (Prepetition claims / claim analysis) - BarTech |
| Rendering set | Standard |

| Legend: | |
|---|---|
| <u>Insertion</u> | |
| ~~Deletion~~ | |
| ~~Moved from~~ | |
| <u>Moved to</u> | |
| Style change | |
| Format change | |
| ~~Moved deletion~~ | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|

|                 | Count |
|-----------------|------:|
| Insertions      | 7     |
| Deletions       | 6     |
| Moved from       | 0     |
| Moved to        | 0     |
| Style change    | 0     |
| Format changed  | 0     |
| Total changes   | 13    |

EXHIBIT H
(as of ~~4/13/23~~6/6/23)

~~Potential~~Assumed Contracts and Leases ~~to be Assumed~~ - With Cure Costs *
The Bar Tech Group of Illinois- Chapter 11 Plan of Reorganization

| Creditors | Contracts/ Agreement/ Lease | Cure Costs | NOTES |
|---|---|---|---|
| PNC Bank/ PNC Equipment Finance LLC (assignee of Altec Capital) | Equipment Lease (6/2021) | $0.00 | Total proof of claim amount $296,388.20 |
| Runnion Equipment Company | Equipment rental agreement (11/2021) | $11,370.00 | Total proof of claim amount $67,000.00 |
| Aldridge Electric Inc. | Work Release Agreements dated 7/28/20, 2/16/21, 3/15/21, 3/19/21, 3/2/22. | | |
| | Other contracts and agreements of the debtor not already rejected, including rights of the debtor under certain Collective Bargaining Agreements (CBA) and other agreements, to the extent applicable, including but not limited to the following: | | See Exhibit ~~G for list~~C (Pre-petition Claims), Exhibit D (Accrued Administrative Expense Claims/ Post-Petition), and Exhibit G (List of ~~Union entities~~Unions), to the extent applicable. |
| | Collective Bargaining Agreement between International ~~brotherhood~~Brotherhood of Electrical Workers (AFL-CIO) and Middle States Electrical Contractors Association of the City of Chicago (May 2021 to May 2025) | | |
| | Collective Bargaining Agreement between Middle States Electrical Contractors Association of the City of Chicago and International Brotherhood of Electrical Workers Local Union No. 9 | See Plan Exhibit G (list of Unions) for pre-petition and post-petition amounts. | Local 9 filed proof of claim for $191,627.11 (priority $152,812.07, and unsecured $38,815.04). National Electrical Ben. Fund 9 has scheduled claim of $3,646.66. |
| | Inside Wireman Agreement, dated June 1, 2021, between Washington D.C. Chapter National Electrical Contractors Association, and Local Union No. 26 International Brotherhood of Electrical Workers | See Plan Exhibit G (list of Unions) for pre-petition and post-petition amounts. $113,118.50 priority claim owed to Local 26 pursuant to Mass. Electric Stay Relief Motion. | Local 26 filed proof of claim for $177,076.23 (priority $161,603.14, and unsecured $15,473.09). |
| | Fence Agreement between Fence Contractors Association of Greater Chicago, Inc. and Architectural and Ornamental Ironworkers' Union, Local 63, of the International Association of Bridge, Structural, Reinforcing and Ornamental Iron Workers (AFL-CIO) (effective June 2020 to May 2025) | See ~~Priority Tax Claim Amount in Exhibit C to the extent applicable~~Plan Exhibit G (list of Unions) for pre-petition and post-petition amounts. | petition amounts |
| | Principal Agreement by and between The Electrical Contractors' Association of City of Chicago and Local Union No. 134 International ~~brotherhood~~Brotherhood of Electrical Workers (dated Aug 25, 1021, as amended to May 31, 2026) | See Plan Exhibit G (list of Unions) for pre-petition and post- | |

See Plan Exhibit G (list of Unions) for pre-petition and post-petition amounts.

Local 701 filed proof of claim for $177,513.58 (priority $53,190.24, and unsecured $124,323.34). National Electrical Ben. Fund 701 has scheduled claim of $2,775.13

Local 63 filed priroity proof of claim for $163,795.98 (ballot voted claim amount of $184,055.99)

Stipulation between the Debtor and Local 134 [Doc. No. 321] addresses cure costs in the amount of $92,504.16. National Electrical Ben. Fund 134 has scheduled claim of $10,819.89. Electrical Insurance Trustees filed proof of claim for $66,788.91 ($55,657.43 priority, and $11,131.48 unsecured).

Inside/ Commercial Agreement by and between The DuPage County Division, Northeastern Illinois Chapter, NECA and Local Union 701, IBEW

\* NOTES:

theThe Debtor reserves all rights as to whether a purported lease is a "true" lease or financing transaction, and as to whether a contract is "executory" for purposes of section 365 of the Bankruptcy Code Total proof of claim amount $296,388.20

Total proof of claim amount $67,000.00

Document comparison by Workshare 10.0 on Tuesday, June 6, 2023 8:19:32 PM

| Input: | |
|---|---|
| Document 1 ID | file://H:\Personal\3625538_1.pdf |
| Description | 3625538_1 |
| Document 2 ID | iManage://BOSDMS/IMAN1/3630909/1 |
| Description | #3630909v1<IMAN1> - v 5 Exhibit H for (modified) 4th amended Ch 11 plan - list of contracts and leases to be assumed with cure costs (Bar Tech) |
| Rendering set | Standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 50 |
| Deletions | 21 |
| Moved from | 1 |
| Moved to | 1 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 73 |